JOHN McALPINE v. JOHN MILLEN.[1]

May 22, 1908.

Nos. 15,463—(14).

**Accounts Properly Kept.**

In an action for an accounting, it is *held* that the evidence sustains the findings of the trial court that the defendant kept proper and honest books of account and made a true and correct accounting of the business of the firm.

**Contract Created Partnership.**

A certain contract construed, and *held* to provide for the conduct of a business as a joint enterprise, thus creating a partnership relation between the parties.

**Partnership Depends on Intent.**

The existence of a partnership depends upon the intention of the parties, and this intention is to be ascertained from the evidence and

[1] Reported in 116 N. W. 583.

104 M.—19

all the circumstances of the case. If the evidence shows that the parties intended to combine their property, labor, and skill in a given enterprise as principals for the purpose of enjoying the profits, it establishes a partnership. It is not essential that anything be said with reference to losses.

**Management of Joint Business.**

The management of the partnership business and the extent to which the business shall be conducted by any particular partner is a matter which may be arranged between the partners, and is of no importance upon the issue whether the partnership exists.

**Duty of Partners.**

Where a partnership agreement provides that one partner shall have the sole and exclusive management of the business, and he in fact exercises such control, he must account to the other partners as a trustee for all moneys and property of the firm which came into his hands. But where, notwithstanding such provision, the other members of the firm actually participate in the management and control of the business, they assume equal responsibilities and all are equally responsible for the results of the business. Under such circumstances one partner is personally responsible only for the results of his fraudulent conduct or other breach of duty.

**Good Faith.**

In dealing with each other the partners must exercise the most scrupulous good faith.

Oral evidence of what occurred before the signing of a written contract, which is clear and unambiguous and purports to contain all the terms of the agreement, is not admissible for the purpose of showing that the parties did not intend that the ordinary legal inferences should be drawn from the express provisions of the contract.

Action in the district court for St. Louis county for an accounting under a certain contract, or in case an accounting cannot be had that defendant be required to account to and pay over to plaintiff the full value of all timber turned over to him under the contract. Defendant interposed a counterclaim in the sum of $17,975 for money loaned to plaintiff. The case was tried before Dibell, J., who made findings and ordered judgment in favor of defendant for $19,240.72 and that he is the owner of the assets set over to him in the findings. From an order denying plaintiff's motion for a new trial, he appealed. Affirmed.

*Ross & Dwyer* and *J. N. Searles,* for appellant.
*L. C. Harris* and *H. B. Fryberger,* for respondent.

ELLIOTT, J.

In August, 1902, the appellant, McAlpine, purchased from Richardson & Avery a large tract of timber in Lake county, Minnesota, for which he agreed to pay $240,000. Of this sum $60,000 was paid in cash when the contract was signed, and the balance was payable in three annual instalments of $60,000 each, with interest on the deferred payment at the rate of five per cent. per annum. McAlpine was also the owner of a state timber permit, on which he had paid $1,500 and was obligated to pay the balance of the purchase price of the timber cut therefrom at the rate of $7.50 per thousand. On December 2, 1902, McAlpine and the respondent, Millen, entered into a written contract in the following terms:

Said parties mutually agree each with the other:

1. That upon the payment to said McAlpine by said Millen of the sum of fifty thousand dollars, said McAlpine will assign and convey to said Millen an undivided one-half interest in and to that certain contract for the purchase of timber in town 55 north, range 11 west, in Lake county, Minnesota, known as the Richardson & Avery timber and shown on plat attached, said contract bearing date August 1st, 1902, and made by Delia A. Richardson and others with said John McAlpine; also an undivided one-half interest in. the logging permit issued by the state land commissioner for section 36, township 56 north, range 13 west, St. Louis county, Minnesota.

2. It is expressly understood and agreed that for the same said Millen shall pay, as the purchase price, $32,025, and the money being paid in excess thereof, $17,975 is a loan and is to be repaid, with interest thereon at the rate of five per cent. per annum.

3. In consideration of the foregoing it is mutually agreed that the timber aforesaid shall be cut and manufactured by contract or otherwise, and the product thereof sold for the joint account of the parties thereto, and in so doing it is ex-

pressly understood and agreed that said Millen shall provide all funds required for financing the operation, over and above what he may be able to get from the produce in advance payments on sales, including the necessary payments for stumpage, and shall have sole control and management of the business in the operation of logging, manufacturing, and selling of the product, each of the parties hereto to share equally the profits of said business and investment, and to jointly perform the obligations of said McAlpine under the said contract and said logging permit.

4. It is understood that for advances made the business shall pay interest at the going rates, and that money shall not be withdrawn sooner than said Millen shall deem prudent for the profitable conduct of the business.

Three days after this contract was made McAlpine and Millen entered into a contract with one Smith, whereby Smith agreed to log the timber on the Richardson & Avery tract and deliver the logs on cars to the D. & I. Railway Company for four dollars per thousand. On the following day they entered into a contract with the St. Louis Lumber Company by the terms of which the company agreed to haul the logs from the same tract for a consideration of $2.50 per thousand. About the same time another contract was entered into with the American Lumber Company of Chicago, whereby the company agreed to purchase all the No. 3 and better lumber to be manufactured from the timber cut from the Richardson & Avery tract, and to pay therefor $18.25 per thousand. These contracts were all executed by McAlpine and Millen in their individual names. Arrangements were then made for the logging and sawing of the timber and the sale of the lumber. McAlpine and Millen caused the initial steps to be taken for the organization of the corporation under the name of the McAlpine Lumber Company. The company was never in fact legally incorporated, but the business was carried on in the name of the McAlpine Lumber Company and the corporate form was used. Millen acted as president and McAlpine as vice president. The work of cutting the logs and transporting them to Duluth was then commenced. McAlpine seems to have taken charge and control of the

logging operations, and Millen supervised the manufacture of the logs into lumber and attended to the financial part of the business.

By the fall of 1904 the business was concluded, and as a result Millen claimed that there had been a loss including interest paid on the deferred payments due to Richardson & Avery and other moneys borrowed and used in the business, of more than $70,000. McAlpine was dissatisfied, and brought an action for an accounting, in which he claimed that Millen entered upon the performance of the contract, and carried on the cutting, hauling, and logging of the timber, and caused it to be sawed at various sawmills, and marketed the products; that he made all the expenditures, received and handled all the money, and in all respects exclusively controlled and managed the same, and disposed of all the lumber, except the small portion handled by McAlpine and duly accounted for. It was further alleged that Millen had received more than $300,000 for the products in excess of the disbursement, and that he had negligently and fraudulently failed to keep just and true accounts, but, with the intent to defraud McAlpine, had falsified the books, and so kept and caused them to be kept that they did not correctly represent the actual state of the business. It was further charged that one Whyte had been fraudulently employed by Millen to falsify the books, and that Whyte, with the knowledge and consent of Millen, had appropriated large sums of money, made false entries, and failed to enter actual transactions upon the books.

The answer denied all the allegations of fraud, and alleged that the business had been conducted by McAlpine and Millen jointly, and as a copartnership, under the firm name and style of the McAlpine Lumber Company; that the affairs and business policy were at all times under the joint management and control of McAlpine and Millen; that in carrying on the business McAlpine had exclusive charge and control of the logging operations; that Millen attended to the sawing of the lumber, and that by agreement between the parties John W. Bayley and Elmer Whyte had charge of the books of the company and control of the details of the business; that the defendant, Millen, had truly accounted for the property which had come into his hands; that he had advanced $30,000 for the benefit of the firm in excess of the amount advanced by McAlpine; and demand-

ed judgment on a counterclaim for the sum of $17,975, which he had loaned to McAlpine on December 2, 1902.

As the attack in this court is principally on the correctness of the findings of the trial court, it is necessary to set out portions of the findings in full. The court found:

"That on August 1, 1902, said plaintiff, John McAlpine, purchased of Delia A. Richardson and others several thousand acres of standing timber, mostly pine, by a contract of that date, drawn in the form of a lease, for which he agreed to pay $240,000; that at the date of said contract he paid $60,000 in cash thereon; that the balance of $180,000 was to be paid in three annual payments, of $60,000 each, with interest at five per cent. per annum, payable annually; that by the terms of said contract said plaintiff was given the right to remove from said lands such quantities of said timber as he might desire upon paying $7.50 per thousand feet therefor; that said lands and timber are commonly referred to as the Richardson & Avery lands and timber.

"2. That on December 2, 1902, said plaintiff was the owner of a timber permit, issued by the state of Minnesota, covering section 36, in township 56, range 13, upon which he had made an initial payment of $1,500; that said permit provided that there should be paid to the state a total price of $7.50 per thousand feet, bank scale, for the timber thereon, of which total price said $1,500 was a part.

"3. That on December 2, 1902, said plaintiff and said defendant, John Millen, entered into an agreement in writing, whereby said defendant purchased of said plaintiff a one-half interest in said contract, covering the Richardson & Avery lands, and said state section permit, for the sum of $32,025, said sum being made up of the sum of $30,000, which was one-half of the first payment made by said plaintiff upon the Richardson & Avery lands, the sum of $775, which was one-half of the commissions upon the purchase of the Richardson & Avery lands, the sum of $750, which was one-half of the advance payment made by said plaintiff upon the state section permit, and $500, which was one-half of the interest on the first payment of $60,000 made by said plaintiff upon the Richardson & Avery contract, at five per cent., from August 1, 1902, to December 2, 1902;

that at the same time, and as a part of said agreement, said defendant agreed to loan said plaintiff the sum of $17,975, which was to be repaid, with interest at five per cent. per annum, which sum, with the aforesaid sum of $32,025, made the sum of $50,000 which latter sum said plaintiff was at the time desirous of raising for his own uses; and that by said agreement it was agreed that said timber should be gotten out as a joint venture, in accordance with said agreement, a copy whereof is set forth in the complaint herein.

"4. That thereupon on said December 2, 1902, said defendant, pursuant to said agreement, paid said plaintiff the sum of $50,000.

"5. That thereafter certain of the Richardson & Avery timber was exchanged for timber belonging to the Alger-Smith Co., by which exchange said plaintiff and defendant received less timber in fact than that with which they parted, but timber which it was thought was of equal or greater value to them, because of its location, in their logging operations.

"6. That upon the making of said contract of December 2, 1902, said plaintiff and said defendant entered upon the work of getting out the timber under said contract; that said business was conducted under the name of the McAlpine Lumber Co., of which said defendant assumed to be the president and said plaintiff assumed to be the vice president; that said company was not in fact legally incorporated, although steps looking towards its incorporation were taken; that said plaintiff took an active part in the management of said company, especially in the logging operations thereof; that he looked after the equipment and operation of the logging railroad; that he brought to the defendant the contractor who first entered into a contract for getting out the Richardson & Avery logs, and in connection with the defendant executed a contract with such contractor therefor; that afterwards he cancelled such contract and engaged a man to superintend the getting out of the logs; that he bought supplies, tools, and appliances; that he directed how the work should be done; that he hired men and fixed their wages; that in connection with the defendant and in the name of the company he entered into contracts for sawing and for the sale of the product; that he took practical charge of the execution of the contract with the Scott-Graff Co. for the logging transportation, and sawing of the school section

timber; that he bought between 800,000 and 900,000 feet of logs in addition, which were sawed at the Scott-Graff mill; that to some limited extent he sold the manufactured product; that he took control of getting out the cedar and pulpwood belonging to said company, and bought cedar and pulpwood in considerable amounts from others, and sold the same; that substantially all of the timber products manufactured at the Scott-Graff mill were financed through the office of the McAlpine Lumber Co., of which the defendant had general supervision, and records of the same were kept; that the general practice was to keep the records in the office of the plaintiff, and to furnish statements to the office of the company, but in some instances no statements were furnished until the trial; and that in buying logs for use at the Scott-Graff mill, and in having them sawed, and in the operations in connection therewith, said plaintiff was substantially in exclusive control.

"7. That said defendant in a general way looked after the interests of said company, but largely through the office of the company, which he caused to be properly equipped; that he financed the operations of the company; that for the most part he saw to it that the product was properly marketed, and saw to the making of sawing and selling contracts; that he caused books of the company to be kept, and in a proper manner, so that the condition of the affairs of the company could be ascertained; that in conducting said business he was not guilty of negligence, nor of fraud, as alleged in the complaint or otherwise; that he did not appropriate to his own use, without accounting therefor, large, or any, sums of money, as alleged in the complaint or otherwise; that no one of the employees charged with the duty of keeping the books or accounts of said company fraudulently or otherwise appropriated large, or any, sums of money to his use, as alleged in the complaint or otherwise; and that said books or accounts were not manipulated, nor were false entries made therein, so as to deceive said plaintiff, as alleged in the complaint or otherwise.

"8. That said company invested in said Richardson & Avery timber, said school section, and other logs and timber products bought, upwards of $275,000, and the products thereof were sold for upwards

of $700,000, and that said company at the time of the trial had a small amount of assets and liabilities as hereinafter set forth.

"9. That said defendant has fully accounted for all property of said company coming into his hands, and that said plaintiff has fully accounted for all property of said company coming into his hands."

The account is then stated, and judgment ordered in favor of the defendant.

The appellant contends that the court erred in sustaining the plaintiff's objections to certain questions, and in finding (1) that by said agreement it was agreed that the timber should be gotten out as a joint venture; (2) that upon the making of the contract of December 2, 1902, McAlpine and Millen entered upon the work of getting out the timber under said contract; (3) that Millen caused books of the McAlpine Company to be kept in proper manner, so that the condition of the affairs of the company could be ascertained, and that there was no fraud in connection with the keeping of the books; and (4) that the defendant had fully accounted for all property of the company which came into his hands. Numerous other assignments of error are predicated upon the alleged erroneous findings as to the amount of money advanced, collected, received, and owed by the various parties.

The appellant questions the conclusion of the trial court that under the original agreement between McAlpine and Millen the timber was to be gotten out as a joint venture, and the claim of the respondent that the parties entered upon the business as partners on terms of equal responsibility for the result. His claim is that under the contract, which provided that the respondent should have the sole control and management of the business, Millen was a trustee of the property, and charged with the duties of a trustee with reference to accounting therefor, and that nothing was ever done by McAlpine during the operations which relieved Millen of the duty of accounting as a trustee. Either theory would require Millen to make a proper accounting of the business.

As said in McDonald v. Campbell, 96 Minn. 87, 104 N. W. 760, there is no arbitrary test by which to determine when a partnership exists. It depends upon the intention of the parties, and this inten-

tion must be ascertained from the evidence and all the circumstances of the case. If the evidence shows that the parties intended to combine their property, labor, and skill in an enterprise as principals for the purpose of enjoying the profits, it establishes a partnership. The question always is, was there a joint business, or were the parties carrying on the business as principals and agents? If there is a joint business, it naturally follows that the parties were to share the profits in some proportion, and hence an agreement to share profit is strong evidence that the enterprise was to be conducted as a joint undertaking. As said by Lindley: "An agreement that something shall be attempted with a view to gain, and that the gain shall be shared by the parties to the agreement, is the grand characteristic of every partnership." Lindley, Partn. § 1. Of course, this inference may be overthrown by evidence showing that the profits were to be shared on some other basis than as joint owners. It was at one time thought that an agreement to bear losses, as well as to share profits, was essential to the existence of the partnership relation, and this idea finds expression in many of the definitions which have been collected by Lindley from statutes and civil and common law writers. But the modern conception of a partnership as a joint enterprise with a view to gain leaves the question of losses to be determined from the evidence, and in the absence of any contract to the contrary infers an agreement to share losses from an agreement to share profits. The management of the business and the extent to which the business shall be conducted and be under the control of any particular partner is also left to be arranged by the members of the partnership. The sole management may by agreement be vested in one partner. Anthony v. Wheatons, 7 R. I. 490, 499.

Applying these principles to the facts of this case, it is very clear that the trial court properly drew the inference that McAlpine and Millen were engaged in a joint enterprise, and that the law presumed equal responsibility for losses from the express agreement in the contract that the profits should be divided equally. McAlpine was the owner of the timber contracts. Millen agreed to pay him a sum equal to one-half of what McAlpine had invested, and the parties jointly assumed the obligations which McAlpine had assumed under the contracts with Richardson & Avery and the state. Millen con-

tributed one-half the capital, assumed equal obligations, became an equal owner of the property, and was to share equally in the profits resulting from the cutting and the manufacturing of the timber for the joint account of the partners. Millen was required to furnish the additional capital required to carry on the business, and it was provided that he should have sole control of the management of the business in the operation of logging, manufacturing, and selling the product.

If this latter provision had been observed, and Millen had in fact exercised sole and exclusive control of the business, he would have been charged with some obligations and duties in addition to such as arise out of the partnership relation. Brooks v. Martin, 2 Wall. 70, 17 L. Ed. 732. It is conceded that McAlpine had more or less to do with the business, but the appellant contends that he merely rendered occasional assistance at the request of Millen. But we think that the evidence amply justified the trial court in concluding that the parties modified, or at least ignored, the provision in the original contract with reference to Millen's control, and that McAlpine and Millen, "entered upon the work of getting out the timber under said contract" and actually participated in the business. It appears that McAlpine joined in the execution of nearly every important contract made by the McAlpine Lumber Company, and signed the promissory notes issued by the company for the purpose of obtaining money to carry on the business. He also seems to have personally purchased tools and supplies for the company, purchased lands for the company and offered to sell lands which belonged to the company, directed how the business should be done in the company's camp, hired scalers and camp employees and fixed their wages, ordered the payment of wages to the company's employees, cancelled the contract with Smith, and in at least one instance assumed the right to overrule Millen with reference to the letting of a certain contract. He also admitted that he was a member of the firm and as such interested in the business. He wrote letters in the name of the company and signed them as its vice president. Several times in letters he used phraseology which clearly showed that he then considered himself as interested in the business, as well as the profits, and as having a right to speak in the name of the firm. During the holiday season, without

the knowledge of Millen, he gave away about $200 of the company's money as Christmas presents to its employees. Thus on December 21, 1903, he wrote to Whyte: "You will please accept the inclosed $25 from John Millen and John McAlpine, being the McAlpine Lumber Company, in appreciation of your faithful work." The business was thus carried on as a joint venture, and the trial court was justified in concluding that McAlpine was interested in the business as a business and was equally responsible with Millen for the unfortunate financial results, unless he was able to show that Millen was guilty of fraud, negligence, or other breach of duty. Parsons, Partn. (4th Ed.) § 150; Baker v. Charlton, Peake, 80.

This disposes of the claim that Millen must respond to McAlpine as a trustee for all the property. He must, however, account as one partner to another, and he must make a full and correct disclosure of the condition of the business, and be personally charged with the results of any misconduct. In dealing with each other the partners occupy a position of trust and must exercise the most scrupulous good faith towards each other. Bloom v. Lofgren, 64 Minn. 1, 65 N. W. 960; Kimberly v. Arms, 129 U. S. 512, 9 Sup. Ct. 355, 32 L. Ed. 764; Mitchell v. Reed, 61 N. Y. 123, 19 Am. 252; Williamson v. Monroe (C. C.) 101 Fed. 322. Lindley says that, in any dispute touching any transaction by which one partner seeks to benefit himself at the expense of the firm, he is required to show, not only that "he has law on his side, but that his conduct will bear to be tried by the highest standard of honor." Lindley, Partn. (7th Ed.) p. 342; Blisset v. Daniel, 10 Hare, 522, 536; England v. Curling, 8 Beav. 129. Applying this standard to the conduct of Millen, we have then to determine whether there is evidence in this record which sustains the findings of the trial court that Millen caused proper and honest books of account to be kept and has fully accounted for all the property of the firm which came into his hands. The evidence is found in more than two thousand printed pages of the record, and it is manifestly impossible, if it was desirable, for this court to summarize it within the reasonable limits of an opinion. The burden is upon the appellant to establish the fact that there is no evidence reasonably tending to sustain the findings of the trial court. In this we think he has been unsuccessful. There is, of course, a great deal of conflicting

evidence; but the trial court was in a better position to determine the credibility of the witnesses and the weight and value of the evidence than is this court. The evidence sustains the findings, and the court drew the proper conclusions of law therefrom.

In support of his claim that McAlpine was not to be charged with any of the losses which might be suffered in the course of the business, the plaintiff offered in evidence a draft of the proposed contract which contained a clause to that effect, which had been stricken out by McAlpine, and a memorandum made thereon to the effect that he would not sign a contract which contained such a clause. The contract as signed contained no reference to losses, and the appellant claims that it was error to exclude this original draft. The theory is that what occurred before the final agreement was embodied in a written instrument may be shown, for the purpose of rebutting a presumption which the law would draw from the express provisions of the written contract. But the legal inferences which the law thus draws are as much a part of the written contract as the express provisions thereof. Had this paper been received, it would at the most have shown that McAlpine then desired to make a contract which would exempt him from liability from losses. It would not have shown that the contract actually signed by both parties did not render him liable for such losses. Such evidence is not admissible for the purpose of changing and modifying the effect which the law gives to the provisions of the written contract.

The other assignments of error do not require discussion, as they are directed either to the alleged error of the court in holding that the parties were engaged in a joint enterprise, or question the correctness of specific findings as to the figures involved in the accounting.

We find no errors in the record which justify a reversal, and the order of the trial court is therefore affirmed.