THOMAS B. WALKER v. FLORENCE A. PATTERSON AND OTHERS.[1]

February 26, 1926.

No. 24,779.

Decision in favor of intervening corporation controlled by plaintiff.
  1. Case examined insofar as it involves the intervener. The evidence *held* to support the decision in its favor.

In action for accounting, appellant has burden of proving there is no substantial evidence to sustain balance found due.
  2. In an action for accounting, the finding of a balance due necessarily negatives all items litigated and not allowed in arriving at the balance. The burden is upon appellant to show that there is no substantial evidence reasonably tending to sustain the findings of fact.

[1]Reported in 208 N. W. 3, 7.

No fiduciary relation between negotiators of partnership until they are actually partners.

3. Unless they are limited by something other than the nature of the intended contract, persons negotiating a contract for a partnership deal at arm's length. There is no fiduciary relationship because alone of the fact that one will result if they become partners. Dictum to the contrary in Bloom v. Lofgren, 64 Minn. 1, disapproved.

Specific written agreement for partnership to deal in timber land negatived claim of one partner's daughter that other land owned by plaintiff was also included under general oral contract for partnership.

4. W and A dealt together jointly in the purchase of timber land from 1887 to 1892, acquiring interests in varying proportions in a large acreage. In 1892 they organized a partnership under written articles. They expressly put in *all* the timber lands owned jointly by them. They recited a final settlement of all their prior accounts arising out of land purchases on joint account and the payment by one to the other of the balance so ascertained. They agreed that the result was to leave "them owners," in the proportions indicated, of described land. There was no suggestion in the contract that they owned jointly any other land. It is now claimed that there was a general oral partnership, formed in 1887 and continuing until A's death in 1912, whereby he became the owner of one-half interest in a compact 17,000-acre tract acquired prior to 1887, and not mentioned in the partnership articles. That claim *held* untenable because, among other reasons, the articles, as a contract in writing, integrated all preceding negotiations and contracts between the parties concerning their joint land holdings; the result being not only the settlement but also the contractual and definite statement that the parties were the owners of the land described, the carefully prepared lists of which attached to and made a part of the contract being an enumeration of their joint interests which must be taken as purposefully exclusive of any not included.

Accounts and Accounting, 1 C. J. p. 646 n. 78.
Partnership, 30 Cyc. p. 438 n. 80; p. 440 n. 95; p. 737 n. 73; p. 749 n. 78.

Action in the district court for Beltrami county for an accounting. The case was tried before McClenahan, J., who ordered judg-

ment in favor of plaintiff and intervener. Defendant appealed from an order denying her motion for a new trial. Affirmed.

*H. V. Mercer, Fryberger, Fulton, Hoshour & Ziesmer, H. E. Fryberger* and *Cobb, Wheelwright, Hoke & Benson,* for appellant.

*Ware & Melrin* and *Rockwood & Mitchell,* for respondents.

STONE, J.

Action by a surviving partner for an accounting. In 1892 plaintiff and Healy C. Akeley organized the firm of Walker & Akeley for the purpose of buying and selling timber and timber lands. It continued until 1912, when it was dissolved by the death of Mr. Akeley. Its remaining assets included a large acreage of timber land, most of which had been cut over and some sold under executory contracts. Plaintiff, as surviving partner, has had charge of the firm's business since the death of Mr. Akeley. Claiming that the firm was indebted to him in a large amount, plaintiff commenced this action in 1915 for the purpose of having the accounts settled and the balance due him ascertained and charged by judgment against the remaining assets of the firm. Mr. Akeley died intestate. Through what appears to have been a family settlement, his daughter, defendant Florence A. Patterson, has become the sole owner of Mr. Akeley's interest in the partnership lands. The Akeley side of the controversy has been and is represented by Mrs. Patterson and she will be considered and referred to as the defendant.

Walker & Akeley, over a long period, had important transactions with the intervener, the Red River Lumber Company, a corporation controlled through stock ownership by plaintiff. Defendant by answer and cross-complaint challenged the account between Walker & Akeley and intervener and asked that the latter be brought in as a party to the end that the state of its account with the firm might be ascertained and fixed by judgment. Accordingly the Red River Lumber Company intervened, claimed a balance due it from the firm and joined in the prayer for an accounting. After a trial beginning in May, 1917, but not concluded until February, 1923,

there was a decision for plaintiff and intervener. It determined that there was due intervener, as of May 1, 1924, $73,710.55, and that there was owing plaintiff $81,428.73. Title to the remaining firm property was adjudged in plaintiff as surviving partner for the purpose of administering the assets, paying the debts and closing the firm's affairs, a sale at auction being directed for that purpose. Defendant challenged the decision by motion for amended findings or a new trial which was denied. The appeal is by defendant from the order denying that motion. .

Evidence and argument deal with transactions of more than 30 years and involving many millions of dollars. The record and exhibits make a huge bulk but our task has been much facilitated by the comprehensive findings and explanatory memorandum of the learned trial judge and the invaluable assistance of the written and oral argument here.

1. We dispose first of the issues between intervener and defendant. The questioned transactions were gone into with painstaking detail. Inaccuracies and omissions of accounting were found, some of them involving small and others substantial amounts. The findings are that not a single error was due to dishonesty or other improper motive, but that each and every one of them was due wholly to inadvertence. Particularly do the findings negative the suggestion that plaintiff sought or received any advantage because of his dual interest, he being on the one hand the controlling stockholder of the corporation and on the other one of the two partners. It is established by the findings that "no important transaction of the firm was ever entered into without being submitted to and approved by Mr. Akeley and nearly every written contract made by the firm bore his signature." Next it was found that Mr. Akeley had full knowledge of Mr. Walker's connection with and control of intervener and that he received "a full and true transcript of all journal entries * * * and also a ledger trial balance" monthly from the office of Walker & Akeley. That is but another way of saying that he was advised continuously and accurately of the details of all firm business, including its transactions and the state

of its account with intervener. The important contracts between intervener and the firm seem to have been negotiated and signed on behalf of the latter by Mr. Akeley, Mr. Willis Walker, a son of plaintiff, representing the intervener. There is nothing in the record to require a finding that Mr. Akeley permitted himself or his firm to be defrauded by his partner's son.

The firm and its activities did not by any means constitute all of Mr. Akeley's interests. He was an incorporator and for many years president of the Itasca Lumber Company, engaged in logging and lumbering on a large scale in Minnesota and to a considerable extent in territory not far from that in which intervener and the firm conducted their major operations.

The principal item in controversy with intervener is an admitted trespass by it and the wrongful cutting of timber belonging to the partnership. The finding is that the trespass was committed, but that it was not wilful or of such a nature as to render intervener liable for treble damages under the statute, sections 9396 and 9585, G. S. 1923. The intervener was charged with actual damages for the trespass as of the date thereof. The findings with respect to that item and all of the others involved are so sustained by evidence that we cannot disturb them.

2. With respect to her case both as against plaintiff and intervener, there is complaint for defendant that no express findings were made as to several minor points. That is true, but the whole account was examined and the result stated. So the decision is clearly a finding on all points made and litigated. As to the items not allowed in defendant's favor (many were), it must be taken as a negative finding. In that light we have reviewed it and find nothing warranting modification or reversal. Here, the burden is upon defendant as appellant, to show that there is no substantial evidence "reasonably tending to sustain the findings of the trial court." McAlpine v. Millen, 104 Minn. 289 (300), 116 N. W. 583. In that she has not been successful as to any of the many claims contested below. Only one of those decided adversely to her can be discussed in detail.

3. The main issue concerns a detached but fairly compact tract of some 17,000 acres east of Grand Rapids, referred to as the "iron ore lands." They were acquired by plaintiff prior to 1887. They were then thought of as pine or timber lands only, but subsequently proved to be on the west end of the Mesaba Iron Range and to contain large bodies of ore. Defendant avers that plaintiff has been guilty of fraud in not dealing with them as partnership property and accounting for their proceeds (over $3,000,000) as cash, and that he should now be charged accordingly. Her theory is that these lands, with others then owned by plaintiff, were made the subject of an oral partnership in March, 1887, whereby Akeley became the equitable owner of a one-half interest; that that oral and general partnership continued until Akeley's death in 1912 and was the original and continuing basis of the firm and all its dealings. That, we say, is defendant's theory of the case. The learned trial judge found that it was contrary to fact. For compelling reasons, not all of which need be stated, it is our opinion that the record would not sustain a contrary finding.

Whatever their relationship and obligations to each other after a partnership is formed, the parties are not trustees for each other and there is no confidential relation in their negotiations for the partnership. Unless limited by something other than the nature of the contract they are negotiating, they stand to each other as they would in approaching any other contract relationship. While it is true, as was stated in Bloom v. Lofgren, 64 Minn. 1, 65 N. W. 560, that "in their dealings with each other, partners occupy positions of trust," the rule does not, as that opinion proceeds to state, extend "to those negotiating for a partnership not yet formed." That statement was mere dictum and not necessary to a decision of the case in hand because there was present a positive misrepresentation, amounting to fraud, which induced the partnership. The opinion expressly recognizes that Lofgren, in organizing the partnership, "fraudulently imposed upon those with whom he was dealing."

The true rule is that, unless there is something to limit them other than the fact that a partnership is intended, parties negotiating to

that end deal with each other at arm's length. That was declared by Mr. Justice Sharswood in Densmore Oil Co. v. Densmore, 64 Pa. St. 43, wherein he said, in part, "that any man or number of men, who are the owners of any kind of property, real or personal, may form a partnership or association with others, and sell that property to the association at any price which may be agreed upon between them, no matter what it might have originally cost, provided there be no fraudulent misrepresentation made by the vendors to their associates. They are not bound to disclose the profit which they may realize by the transaction. They were in no sense agents or trustees in the original purchase, and it follows that there is no confidential relation between the parties, which affects them with any trust. It is like any other case of vendor and vendee. They deal at arm's length." To the same effect are Milwaukee Cold Storage Co. v. Dexter, 99 Wis. 214, 77 N. W. 976, 40 L. R. A. 837 and Withroder v. Elmore, 106 Kan. 448, 188 Pac. 428, 10 A. L. R. 191.

There is nothing to the contrary in Shevlin v. Shevlin, 96 Minn. 398, 105 N. W. 257, or Church v. Odell, 100 Minn. 98, 110 N. W. 346. The Shevlin case was not one of partnership but did involve the confidential relationship existing between two brothers where the elder "sustained a quasi paternal relation to [the] younger." The decision in Church v. Odell was not placed upon the existence between negotiators for a partnership of any relation of trust and confidence, but upon the fact that one had led the others "to believe that they all stood on an equal footing and were entitled to share proportionately in all profits realized." The fact was to the contrary. The plaintiff by a secret commission tried to assure himself a substantial profit over and above anything which his associates could make and which had to come out of *their* initial contributions to the enterprise. Our Uniform Partnership Statute, Chapter 487, p. 813, L. 1921 (sections 7384 to 7428, G. S. 1923), has no application to any question arising from the formation of this partnership and we are not concerned with the construction of any part of it, particularly section 21.

So it was plaintiff's privilege to withhold any of his lands from his partnership or other dealings with Mr. Akeley. So also was it his right, in the absence of fraud and none is proven, to charge anything he could get for the property which he put into the firm business.

4. Even in 1887 both Walker and Akeley were experienced timber operators. Akeley was a Michigan lawyer, who had already made a fortune in pine. In a timber deal neither of them needed a guardian. Both understood the use of and need for written contracts and current business records. Their first joint adventure was under a contract in writing, dated March 9, 1887. It bound Akeley to furnish funds with which to purchase pine land in Northern Minnesota to be selected by plaintiff, who was to become entitled to one-half ownership by paying one-half the cost. As the lands were sold, the proceeds were to go first in repayment of Akeley's investment or by agreement to the purchase of additional land. There is nothing about it to suggest that it was incomplete or that there was any previous and dominant contract, oral or written.

Large quantities of land were purchased under that contract. Akeley furnished the money and plaintiff selected the lands and attended to the acquisition of title. The enterprise proved profitable. In each case as lands were purchased, Akeley was advised of their location, extent and the stumpage thereon. Plaintiff's effort was to consult him before making any large commitment.

During 1887 Mr. Akeley was much of the time in Grand Haven, Michigan, and while there corresponded with plaintiff in Minneapolis. We have examined the correspondence of that summer, at least so much of it as is in the record. Taken together and applied to other factors of consideration concerning which there is no dispute, it tends strongly if not conclusively to negative the idea of a previous oral, general and dominating partnership *contract* covering all of the lands plaintiff then owned. It shows clearly that plaintiff had Minnesota timber lands which he was not offering Akeley and which the latter knew he was not getting for the partnership or otherwise.

The next contract bears date of August 18, but was found not to have been closed until October, 1887. Thereby plaintiff sold Akeley an undivided half of his interest in two lists of timber land, one on the basis of $11 and the other at $2.50 per acre. Whether that contract was the result of a prior oral contract or a mere negotiation, it is significant that it did not include the iron ore lands nor any part of them. And if there had been any previous agreement that Akeley was to have half of the ore lands, it is hard to understand why they were not included. It is impossible for fair consideration to suppose that the 17,000 acres should have been included but were fraudulently withheld by plaintiff and other and nearly worthless lands put in as mere "fillers," Akeley the while being kept in ignorance of the artifice.

In negotiating, both parties had before them a map showing by colors or checkings the lands under consideration, and the iron ore lands, then owned by plaintiff. But it is clear either that the latter were not considered at all or deliberately omitted. A 17,000-acre detached tract could not have been inadvertently omitted from such a contract so negotiated between two such men. Nor could it have been extracted secretly and fraudulently. A checking of the descriptions, even a hasty one, or a casual comparison of the contract lists with the plats would have shown instantly that the iron ore lands (now, but not then so-called), had been omitted.

The internal evidence of the sale contract of August, 1887, is all and strongly against defendant's hypothesis concerning the iron ore land. That contract expressly covered a sale to Akeley of an undivided half of all the lands then owned by plaintiff in the townships enumerated—all in the Leech Lake and none in the Grand Rapids area. It was the clear intention to include all of plaintiff's land in the enumerated townships, but none that he owned in others. The possibility of error of description was appreciated and that some of plaintiff's land in "said townships" might have been omitted by inadvertence. So the contract was made to include "any lands which the said party of the first part [plaintiff] may own which [have] been overlooked in any of said townships in this agree-

ment." The destructive effect of that provision on defendant's present claim is obvious. The ore lands were all in townships a long way east of those mentioned.

Every dollar of the several hundred thousand that Mr. Akeley paid plaintiff, on account of lands purchased for joint account, was paid under the two written contracts of 1887. (Excepted from that statement are some incidental and detached transactions not now important, but which were controlled by appropriate writings). It does not appear that plaintiff ever received from Mr. Akeley any money on account of land or timber under an oral as distinguished from a written agreement, contractual or otherwise. The absence of any proof of a single payment referable to an oral contract rather than one of the written ones, indicates strongly that there was no such oral contract under which payment could be made.

March 10, 1892, after they had been in business together about five years, plaintiff and Mr. Akeley entered into a general copartnership under formal articles. The firm was called "Walker & Akeley" and was for the purpose principally of purchasing and selling pine and other land and timber interests.

"In pursuance of and to establish the aforesaid business" the parties agreed "to put into" it, *not part*, but *"all* the timber lands" then owned jointly by them as shown by Exhibit A attached to the articles. In those lands each owned an undivided half. They also put in the lands described in Exhibit B in which plaintiff owned an undivided 45/64 and Mr. Akeley 19/64. They also put in *their* interest in the lands listed in Exhibit C, plaintiff and Mr. Akeley being equal and joint owners with others of the lands covered by that list.

Here again and without consideration of the legal effect of this partnership agreement, we are met with an obstacle to defendant's claim concerning the iron lands. It is impossible to conceive of two such men launching formally and with studied care a new enterprise or reorganizing an old one of such an important and comprehensive character, and at the same time silently keeping alive another similar and preceding one under some oral understanding of five years

before and depending, if still binding, upon nothing but recollection.

But we do not have to content ourselves with mere speculation on that point. The partners put into the articles of March, 1892, the following:

"Upon a full settlement of the accounts between the parties hereto made this day . * * * the said Walker has balanced all accounts arising under the same by paying to said Akeley * * * the sum of $147,052.25 with interest thereon * * * this foregoing settlement adjusts all accounts between the parties hereto for the purchase of pine lands on joint account, leaving them owners in the lands as shown in Exhibits 'A' and 'B' and 'C' in the proportions therein named."

That paragraph evidences a binding settlement of "all accounts * * * for the purchase of pine lands on joint account." For defendant it is argued that the settlement does not bar the iron land claim because, if the ownership of the one-half interest which they claim for Mr. Akeley was concealed from him by fraud, it was kept out of and not affected by the settlement. For the reasons already indicated we think there is no indication of the fraud so claimed, either by evidence or presumption. It is only by excessive fragmentation of the case, followed by an independent consideration of a very few of the fragments, that any other view can be maintained even momentarily. Any such view is dissipated the moment the case is reassembled, as it must be, for final judicial consideration.

However acquired and at whatever time or whether as sole cotenants or as cotenants with others, it is clear beyond all possible doubt that the purpose of the new and general partnership was to bring together every acre of Minnesota timber land in which plaintiff and Mr. Akeley were jointly interested, and, in their own language, to leave "them owners" thereof as indicated. It was intended to and did integrate all their previous contracts concerning such lands, excepting only instruments of title. If it integrated all such previous *written* contracts, as obviously it did, by what manner of reasoning can the supposed *oral* partnership of March 9, 1887, be saved from the merger? The *written* contract of March 9, for the

purchase of land on joint account clearly was merged. Why not also whatever *oral* agreement there was of the same date—or any other previous to March 10, 1892?

The result was not only the partnership agreement as such, but also the careful and obviously exclusive enumeration of the lands in which the partners were jointly interested. To consider the three lists, attached to and a part of the contract, as anything but such exclusive enumeration would ignore a construction which is inescapable under the familiar rule, applicable and controlling here, "expressio unius est exclusio alterius:" It could be done "only by unfair perversion of * * * ostensible meaning and expressed purpose." Thompson v. Germania Life Ins. Co. 97 Minn. 89 (93), 106 N. W. 102. The final contract necessarily excluded the iron ore lands and renders impossible the idea that, either before that contract or after, Mr. Akeley had any interest in them. Incidentally, he was so intimately acquainted with the timber situation in Northern Minnesota that he must have known long before he died, if not in 1887 or 1892, that plaintiff owned those lands in his own right. Moreover, long before he died he must have known of their proximity to the Mesaba ore deposits.

The articles were later amended by two additional memoranda. They are not important here except that neither of them in any way suggests any joint interests, in timber lands or otherwise, outside of those controlled by the partnership articles.

It is thus apparent that defendant's claim of a general and continuing *oral* partnership formed early in 1887 is opposed to every implication, both legal and logical, of many other things proved to the point of demonstration. Such a partnership is opposed by the usual course of business men in such situations. It is negatived by all the contractual and other writings. It is denied finally by both the plain language as well as the legal force of the articles of copartnership, which plainly were intended to be, and in law are, an integration of all the previous joint dealings of the parties in Northern Minnesota timber land.

There is no principle of hermeneutics of peculiar application to articles of copartnership. They are construed by the ordinary rules

for interpreting written contracts. No more than any other written contract are they open to contradiction or variation (as between the parties thereto), by parol evidence of contemporaneous or previous oral negotiations. Like all other written contracts they merge previous oral agreements concerning the same subject matter. Bates, Part. § 210; Boardman v. Close, 44 Iowa, 428; Evans v. Hanson, 42 Ill. 234. Because of their own unambiguous text and clear purpose, the articles now in question cannot be considered as a mere instrument of part performance of a previous and dominant contract of any kind, written or oral. The new contract does recognize older and existing ones and by linguistic as well as legal force merges and supersedes them. For the same reason, the new contract cannot be considered as the reduction to writing of a part only of an existing oral understanding. But, if it could, it would still be final and binding, to the utter exclusion of anything earlier, so far as it covered the joint timber land interests of the partners, within the rule of Wheaton Roller-Mill Co. v. John T. Noye Mnfg. Co. 66 Minn. 156, 68 N. W. 854. That is so because of the obvious effort and purpose to "contain the whole bargain between the parties" and express the result of all their contracts to date.

Insofar as there was a partnership, the relation was one of trust and confidence with its usual results. We have assumed plaintiff to have been a trustee for Mr. Akeley as to all of the properties subject to or affected by their contract relationship. The trouble with the case for defendant at that point is, not that there was no fiduciary relationship, but that the property in question, the iron ore land, is clearly shown never to have been subjected to or affected by that relationship.

Order affirmed.

On March 1, 1926, the following opinion was filed:

PER CURIAM.

This is an appeal from the judgment in the case, the merits of which have been considered and disposed of in the foregoing opinion. Accordingly and for the reasons stated in that opinion, the judgment from which this appeal is taken is affirmed.