554

## FLEISHER ENGINEERING & CONSTRUCTION COMPANY v. WINSTON BROS. COMPANY AND OTHERS.[1]

April 14, 1950.

No. 35,106.

*Brill & Brill,* for appellant.

*C. U. Landrum,* United States Attorney, and *T. H. Wangensteen,* Assistant United States Attorney, for respondents.

[1] Reported in 42 N. W. (2d) 396.

LORING, CHIEF JUSTICE.

This was an action by a subcontractor against the prime contractors for damages for alleged loss of profits arising out of cancellation of a contract or contracts for the erection of housing units on a United States Navy project in Arkansas. The case was tried to the court, which made findings and conclusions in favor of defendants. Plaintiff moved for amended findings or in the alternative for a new trial. The motions were denied. Judgment was entered, and plaintiff comes here on appeal from the judgment.

The principal question presented for decision is whether there was one contract or four separate contracts between the parties. If there was but one, plaintiff may not prevail. The first document involved was a letter of intent, dated November 20, 1944, which was sent to plaintiff by defendants under the authority of a letter of intent from the Navy Department, dated October 2, 1944, and identified as contract NOy-11102, for the construction of a rocket arsenal plant at Shumaker, Arkansas. Defendants were the prime contractors, and plaintiff was made a subcontractor on a cost-plus-a-fixed-fee basis for the erection of a low-cost housing project. The letter of intent to plaintiff authorized it to begin work immediately. It contemplated that the parties would execute a definitive subcontract upon the standard form of the Bureau of Yards and Docks for a cost-plus-a-fixed-fee contract as soon as possible, but during the interim plaintiff was to be reimbursed for obligations incurred because of work done prior to the execution of the definitive subcontract. The fixed fee was to be determined by the Bureau of Yards and Docks. The contract number assigned to the letter of intent in such definitive subcontract was No. 3. The letter provided that all contract provisions required by law to be included in the construction of the definitive subcontract were incorporated in the letter of intent by reference. It further provided that plaintiff's right to proceed thereunder could be terminated in the same manner and upon the same terms as those provided in the standard form of subcontract. The letter of intent concluded with the statement that it

"shall constitute an agreement until the execution of the definitive subcontract or termination hereof."

The Navy contemplated the construction of from 750 to 1,000 low-cost housing units, but the exact figure was not set in the letter of intent. Acting under authorizations from the Navy, the prime contractors authorized commencement of construction of 250 housing units and then increased the authorization to 500 units on February 2, 1945. Plaintiff knew the number of units would ultimately depend upon the progress of the war and upon what directives might come from the Navy Department. Shortly after VE day, on May 19, 1945, a letter of cancellation or so-called "cutback" on the housing project was forwarded by the officer in charge of construction to the prime contractors and by the prime contractors to plaintiff. The basis for the order was the lack of need for additional units. The cutback reduced the number of units to 262. It is for this reduction from 500 to 262 units that plaintiff sues for the loss of anticipated profits.

After plaintiff substantially completed the 262 units, negotiations to determine the fee to be allowed were commenced. A hearing at the Bureau of Yards and Docks took place in August 1945, at which plaintiff was represented by its attorney and by an officer of plaintiff. The Board of Contract Awards of the Navy Department established plaintiff's fee at $80,000. This fee was accepted by plaintiff on September 14, 1945. The definitive subcontract was submitted to plaintiff and executed on September 14, 1945. This contract stated that plaintiff was paid the amount of $80,000 for the construction of 262 housing units. Article 14(a) provided that the contract could be terminated for a default of the subcontractor or at the convenience of the government. Article 34 provided that all rights and obligations of the parties were superseded and merged into the definitive subcontract. It was not until the $80,000 had been paid, or all but $10,000, that plaintiff made any claim for loss of anticipated profits. The district court held that only one contract had been made and that it was embodied in the definitive subcontract

of September 14, 1945. We regard that decision as sound, and it should be sustained.

In the case at bar, the offer and acceptance of the letter of intent from defendants to plaintiff constituted a binding agreement. This is conceded by plaintiff, but it contends that the two orders for 250 housing units each constituted separate contracts. This contention is not sustained by the record. Each order for 250 units was given to plaintiff as a result of its acceptance of the letter of intent. The letter established the right of plaintiff to construct whatever units were ordered, and it specifically provided that plaintiff's right to proceed thereunder could be terminated "in the same manner and upon the same terms as those provided in said standard form of subcontract for the termination of such subcontract." It is clear that the parties intended that the letter of intent should be the only contractual instrument under which the parties were to operate until the execution of the definitive subcontract; but, assuming that the authorizations amounted to contracts, we are of the opinion that they constituted part of one transaction with the letter of intent. The housing authorizations followed the acceptance of the letter of intent and were made under it. The right to accept the housing orders depended upon the letter of intent, and therefore they must be construed with reference to it. Cf. Phillips Petroleum Co. v. Roth, 186 Minn. 173, 242 N. W. 629; Brackett v. Edgerton, 14 Minn. 134 (174), 100 Am. D. 211; 3 Williston, Contracts (Rev. ed.) § 628. As stated in 13 C. J., Contracts, § 487, cited in Wm. Lindeke Land Co. v. Kalman, 190 Minn. 601, 607, 252 N. W. 650, 653, 93 A. L. R. 1393:

"Where several instruments are made as part of one transaction, they will be read together, and each will be construed with reference to the other. This is true, although the instruments do not in terms refer to each other. So if two or more agreements are executed at different times as parts of the same transaction they will be taken and construed together."

In Parker & Wallace v. Oil Well Supply Co. 186 Pa. 294, 298, 40 A. 518, 521, the supreme court of Pennsylvania said:

"* * * It will thus be seen that the preparation of four of the five papers to which we have referred was contemporaneous with or closely followed the application of the plaintiffs to the Oil Well Supply Company to furnish bonds for the dissolution of the attachments. They were obviously the outcome of that application, and they must be construed with reference to it as well as to other matters to which they relate. In construing them the position of the parties, the objects they had in view, and the circumstances surrounding and connected with these transactions must be considered."

In the case at bar, the authorization of an additional 250 units and the letter of intent each referred to contract NOy-11102 and by its terms authorized plaintiff to proceed with the construction of 500 units. The letter of intent stated expressly:

"This Letter of Intent, upon your acceptance, will be effective as of this date, November 20, 1944, and you are authorized and requested as of said date to begin work in order that construction will be expedited."

The letter of intent gave plaintiff the right to proceed and concerned the same subject matter as in the subsequent authorization. The record does not show that the parties intended that each authorization for 250 units was to constitute a separate and distinct contract without any reference to the letter of intent. Cf. Bradley v. Paul, 153 Minn. 441, 190 N. W. 789. As construed together, the right to terminate was an integral part of each authorization. Hence the cutback was permitted by the contract and did not constitute a breach thereof.

■ As we read it, the letter of intent contemplated one contract to cover all the negotiations and dealings between the parties. It states that defendants intended to award to plaintiff a cost-plus-a-fixed-fee *subcontract* to accomplish the completion of the low-cost housing at Shumaker, Arkansas. It states that the contract number assigned to the letter of intent in such definitive subcontract was No. 3. The letter of intent provided that defendants were acting

under the authority of a letter of intent from the Navy Department, identified as contract NOy-11102, and in the exchange of correspondence between the parties in August and September 1945 regarding the fixed fee reference was made to but one contract, namely, NOy-11102. At no time during the negotiations with the Navy Board of Contract Awards in connection with the determination of plaintiff's fee was any reference made to any additional contract or to a breach thereof until after the fixed fee had been determined and substantially paid.

The letter of intent and the negotiations and conduct of the parties, as shown above, plainly indicate that the parties contemplated one contract, the purpose of which was to " 'contain the whole bargain between the parties' and express the result of all their contracts to date." Walker v. Patterson, 166 Minn. 215, 227, 208 N. W. 3, 7. The letter of intent looked forward to the definitive subcontract, and, when executed by the parties on September 14, 1945, all rights under the letter of intent and all dealings and negotiations became merged into the final agreement. Walker .v. Patterson, *supra;* Wetter v. Karels, 172 Minn. 539, 216 N. W. 248; Brawley v. United States, 96 U. S. 168, 24 L. ed. 622; Parish v. United States, 75 U. S. 489, 19 L. ed. 472; Consumers' Cotton-Oil Co. v. Ashburn (5 Cir.) 81 F. 331; Beck v. Megli, 153 Kan. 721, 114 P. (2d) 305, 135 A. L. R. 1124. Cf. Munn v. Town of Drakesville, 226 Iowa 1040, 285 N. W. 644; Holmberg v. United States, 91 C. Cls. 501; Housekeeper Pub. Co. v. Swift (8 Cir.) 97 F. 290. See, Bradley v. Paul, 153 Minn. 441, 445, 190 N. W. 789, 790; Price v. Platte Valley Public P. & I. Dist. 139 Neb. 787, 790, 298 N. W. 746, 748.

Judgment affirmed.

ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On May 5, 1950, the following opinion was filed:

PER CURIAM.

The appellant appeals from the clerk's taxation of $192.90 for the printing by respondents of a supplemental record in the above case, but does not specify what part of the supplemental record was

unnecessarily printed otherwise than to state in broad terms that it consisted entirely of exhibits and that the printing of a summary thereof, in not to exceed six to ten pages in respondents' brief, would have served respondents' purpose. Nor is there a sufficient designation in the objections attached to the appeal to the court of the parts challenged in the copy of the supplemental record. Such a challenge to the taxation is not a compliance with Supreme Court Rule VIII(5) (222 Minn. xxxii, xxxiv), which provides:

"The party entitled to object to the taxation of disbursements in such case shall point out—*specifying the pages or folios*—the particular portions of the record, supplemental record or brief for which he claims the opponent is not entitled to tax disbursements."

The clerk's taxation of costs is affirmed.