## PAUL LEHMAN, EXECUTOR UNDER WILL OF LEO RICHARD COLEMAN, v. CHARLEY STOUT AND ANOTHER.

112 N. W. (2d) 640.

December 29, 1961—No. 38,299.

*I. L. Swanson,* for appellants.

*Field, Arvesen & Donoho,* for respondent.

OTIS, JUSTICE.

The proceedings here for review arise out of two actions which were consolidated and tried by the district court without a jury to determine the title to real estate in Section 30, Township 129, Range 44 West, Grant County. The first suit was brought by Charley Stout on behalf of his minor son, James William Stout, against Paul Lehman as executor of the estate of Leo Richard Coleman, and resulted in a judgment awarding to James the southwest quarter of the section. No appeal has been taken from the judgment in that action which was entered March 8, 1960.

The second suit is one in which the executor of the Coleman estate has secured a judgment against Charley Stout and Mildred Stout divesting them of title to the northwest quarter of the section. This appeal is from an order denying the motion of the defendants Stout to amend the findings or in the alternative to grant a new trial or to reopen the hearing for further testimony.

In the summer of 1950 Mr. and Mrs. Stout, who were then residents of Montana, made a trip to Minnesota, and among other relatives they visited Mr. Stout's uncle, Leo Coleman, who was then living on the farm here under consideration. After some correspondence with him, the Stouts moved to Minnesota in March 1953 and established their home with Coleman on the farm. At that time they entered an oral contract which in substance obligated the Stouts to help Coleman with the farming and with the operation of the household and to live with Coleman as members of the same family. In return Coleman agreed to pay Stout "good wages" and to give Stout's minor son, James, a quarter section of his land.

It is the contention of the Stouts that during the year 1953 Coleman assumed the household and farming expenses but neglected to pay Stout the wages which were promised. Consequently, Stout negotiated with Coleman for a lease which would guarantee Stout some cash income in lieu of wages, and such a lease was executed in December 1953 covering both the northwest quarter and the southwest quarter of Section 30.

At the time the Stouts took up residence on the farm, Mr. Coleman, who was a bachelor and living alone since the death of a brother, had developed slovenly and intemperate habits which from time to time imposed on the Stouts an almost intolerable burden. In January 1955 Coleman's addiction to alcohol resulted in his being found on the highway very nearly frozen to death. As a result of his exposure, both of his hands were amputated, and he suffered severe injuries to his nose, ears, and feet. Coleman was hospitalized in Breckenridge, Fargo, and Minneapolis until December 1955 when he again returned to the farm. He lived with the Stouts continuously thereafter until his death on November 30, 1958, except for one winter when he resided at the Soldiers Home in Minneapolis. When Coleman returned to the farm from the hospital, he was fitted with artificial hands, but his handicap resulted in additional demands on the Stouts and required them to assume even greater responsibility for his personal care. Unfortunately, his disability did not correct his drinking habits but simply increased his dependence on the members of the family.

In 1957 the family residence was torn down and replaced with a

converted schoolhouse to which was later added a small building characterized by the Stouts as a bunkhouse, and by respondent as a brooder house, in which Coleman slept and to which he could retire for privacy. He otherwise continued to make his home in the Stouts' residence. In October 1956 when he had been out of the hospital and back on the farm for a period of about 10 months, Coleman consulted counsel in Elbow Lake who, at his direction, drafted a contract for maintenance and a quitclaim deed which is the subject of this litigation. On October 8, 1956, Coleman and Mr. and Mrs. Stout signed and acknowledged in the presence of two witnesses the following instrument:

"October 8th, 1956
Elbow Lake, Minnesota

"CONTRACT FOR MAINTENANCE

"It is on this 8th day of October, 1956, agreed by and between Charley F. Stout and Mildred M. Stout, his wife, parties of the first part and Leo R. Coleman, party of the second part that Whereas the party of the second part is a single man and is of poor health and is desirous of becoming a part of the home maintained by parties of the first part, that in consideration of the conveyance by party of the second part to parties of the first part of the North one-half of the west One-half (N½ W½) of Section Thirty (30), in Township One hundred twenty-nine (129), Range forty-four (44) West, all lying in the County of Grant, and State of Minnesota, that parties of the first [part] hereby agree to provide a home, consisting of lodging and food on the same standards as parties of the first part maintain for their own family, to party of the second part for the rest of his life.

\*   \*   \*   \*   \*

"/s/Leo R. Coleman
/s/Charley F. Stout
/s/Mildred M. Stout"

Contemporaneously, Coleman executed and delivered to the Stouts a quitclaim deed covering the northwest quarter of the section, where the improvements are now located, that conveyance being the subject of this litigation.

Although the Stouts testified that Coleman orally agreed to transfer to their minor son James the southwest quarter, Coleman made no provision for James either through an inter vivos conveyance or by testamentary disposition. Following Coleman's death, the two actions referred to were commenced.

In the first case the trial court found that the Stouts had fully performed their oral contract to care for Coleman and that their minor son was entitled to judgment that he was the owner of the southwest quarter of Section 30. In the other matter, Lehman, as executor, seeks to have the deed to the northwest quarter set aside as null and void and expunged from the records, on the theory that there was no consideration for the conveyance. The trial court found that the services the Stouts performed were in reliance on their oral contract affecting the southwest quarter, and that they did not fulfill this obligation in reliance on the quitclaim deed affecting the northwest quarter. Accordingly, the court held the deed to be without consideration and entered judgment declaring it null and void, expunging it from the records, and adjudging Coleman to be the owner of the northwest quarter at the time of his death.

■ It is the contention of the Stouts that although the oral contract originally contemplated both a conveyance of a quarter section to their son and the payment of "good wages," their agreement with Coleman was subsequently amended to delete the provision for "good wages." They argue that Coleman's obligation to pay "good wages" was modified first by the substitution of two leases from Coleman to the Stouts, and later by the written contract and the delivery of a deed to the northwest quarter. It is their position that these amendments in no way affected Coleman's obligation to transfer the southwest quarter to their son, James, upon their faithfully performing their part of the contract. The respondent on the other hand asserts that the agreement of October 8, 1956, was a separate contract requiring independent consideration and was invalid because it merely exacted additional consideration from Coleman for services which the Stouts were already obligated to perform.

We do not subscribe to either of these views and hold that the rights of the parties are governed exclusively by the terms of the written con-

tract executed by them on October 8, 1956, which we hold superseded all previous agreements.

In reviewing the testimony of Mr. and Mrs. Stout we find no substantial difference between their obligation to Leo Coleman under the terms of their oral agreement and their obligation under the contract of October 8, 1956. The subject of each contract is essentially the same. Each requires the Stouts to provide a home for Leo Coleman and to operate the farm and maintain a household for him during the remainder of his life. We therefore reject the respondent's contention that the oral and written contracts covered separate subjects and required separate consideration.

We are of the opinion that under well-established principles, all of the contracts, agreements, or arrangements entered by the parties prior to October 8, 1956, were merged and integrated into their written undertaking of that date. Defendants may not be heard to claim they retained contractual rights which are not specified in that document. Pearce v. McGowan, 35 Minn. 507, 29 N. W. 176; Blondel v. Le Vesconte, 41 Minn. 35, 42 N. W. 544; Cable v. Foley, 45 Minn. 421, 47 N. W. 1135. The doctrine of integration is stated in Restatement, Contracts, § 228, thus:

"An agreement is integrated where the parties thereto adopt a writing or writings as the final and complete expression of the agreement. An integration is the writing or writings so adopted."

Integration is closely allied to the parol evidence rule and that relationship is described in Restatement, Contracts, § 237, as follows:

"* * * the integration of an agreement makes inoperative to add to or to vary the agreement * * * all prior oral or written agreements relating thereto."

Ordinarily, but not always, the rule is applied to a writing which simply embodies the final terms of an agreement after the parties have completed informal oral negotiations.

"* * * The purpose of confirming oral agreements by writing is to avoid misunderstandings, and all preliminary negotiations are understood to have been waived, abandoned, and merged into the writ-

ing. * * * it must be conclusively presumed that the whole engagement of the parties and the manner and extent of their undertaking was reduced to writing." Steward v. Nutrena Feed Mills, Inc. 186 Minn. 606, 608, 244 N. W. 813, 814, cited with approval in Haglin v. Ashley, 212 Minn. 445, 450, 4 N. W. (2d) 109, 112.

The rule in Minnesota was succinctly reiterated by Mr. Justice Peterson in Karger v. Wangerin, 230 Minn. 110, 114, 40 N. W. (2d) 846, 849, in this manner:

"The rule has become mere hornbook law that, where parties have reduced their contract to writing, the contract may not be proved by prior or contemporaneous utterances or writings and that these are entirely immaterial for the purpose of determining what the terms of the contract are. By making the writing the only depository and memorial of the contract, what was said during the negotiations therefor or at the time of its execution must be understood to be superseded by the writing, and so much of what was thus said as is not carried forward into the writing must be deemed to have been waived or abandoned. The rule is not one of evidence, but of substantive law— the writing is the contract, not merely the evidence thereof. Antecedent and contemporaneous utterances are excluded, not because they are lacking in evidentiary value, but because the law for substantive reasons declares that such matters shall not be shown. If the rule were otherwise, there would be an absurd futility in written contracts which it is the purpose of the parol evidence rule to prevent. * * *

"As applied here, the first cause of action simply amounted to an assertion by plaintiff of a right to recover not upon the written contract between the parties, but upon one based upon prior and contemporaneous utterances at variance therewith. This, of course, cannot be done under the parol evidence rule."[1]

That the doctrine of integration and merger is not confined to cases of oral negotiations occurring immediately prior to a written contract

---

[1]See, also, Fleisher Engineering & Const. Co. v. Winston Bros. Co. 230 Minn. 554, 42 N. W. (2d) 396; Jimmerson v. Troy Seed Co. 236 Minn. 395, 53 N. W. (2d) 273.

is demonstrated by our decision in Walker v. Patterson, 166 Minn. 215, 208 N. W. 3. In that case the plaintiff sought an accounting of partnership assets after the death of his partner with whom he had been engaged in the lumber business. The daughter of the deceased partner, who had acquired his interest, based her counterclaim on the terms of an oral partnership alleged to have been entered by the parties 5 years prior to the execution of formal written articles of partnership. Our court observed that defendant's claim of a continuing oral partnership was denied by both the plain language and the legal force of the articles of copartnership, and we held that the articles constituted an integration of all previous dealings of the parties.

It is therefore our conclusion that all of the consideration running from Leo Coleman to the Stouts for services rendered, or to be rendered by them, is deemed to have been embodied in the contract of October 8, 1956. Under the doctrine of integration and merger no other or different consideration may be shown beyond that specified in the written contract for maintenance.

█ The respondent, Lehman, contends that the written contract is invalid because it exacts additional consideration from Leo Coleman for services which the Stouts were already obligated to perform. Respondent relies on Michaud v. MacGregor, 61 Minn. 198, 63 N. W. 479. The Michaud case holds that where a party to a contract refuses to perform unless promised some further benefit beyond that called for in the instrument, the other party may waive his right to require performance according to its original terms, and the new promise to increase compensation will be binding. Respondent contends that the Stouts did not state they would not perform unless Coleman conveyed the northwest quarter to them; that Coleman did not waive his right to enforce the terms of the oral contract; and that the written promise to convey was therefore not sufficiently supported under the rule set forth in the Michaud case.

A decision which is more nearly applicable is King v. Duluth, M. & N. Ry. Co. 61 Minn. 482, 63 N. W. 1105. There a railroad contractor ran into what he claimed were unforeseen difficulties in construction and demanded additional compensation as a condition to continuing with the work. We stated that ordinarily a promise to pay an additional

amount for what the other party was already obligated to perform was without consideration. We noted an exception to the rule where unforeseen and substantial difficulties occurred which were not known or anticipated by the parties. In such instances we suggested that a promise to pay additional benefits was valid. However, we found that in that particular case the contractor had not shown substantial and unforeseen difficulties which were not in the contemplation of the parties when the contract was entered. Although we do not rest our decision on the Michaud decision and the dictum in the King case, it might be argued that the disability suffered by Leo Coleman in losing both hands imposed a substantial unforeseen burden on the Stouts not contemplated by the parties at the time of their original contract and justified a promise to provide additional consideration for the services to be rendered. However, in our view of the matter, the parties merely reduced their oral contract to writing and in so doing modified the consideration by substituting, for a promise to convey the southwest quarter to James, an actual conveyance of the northwest quarter to his parents. That courts will not scrutinize the relative value of one form of consideration substituted for another is well established. Restatement, Contracts, § 419, *Illustration* 2; Rye v. Phillips, 203 Minn. 567, 282 N. W. 459, 119 A. L. R. 1120; Brack v. Brack, 218 Minn. 503, 16 N. W. (2d) 557; Olson v. Penkert, 252 Minn. 334, 90 N. W. (2d) 193.

We have held that the new agreement is adequate consideration for abrogating the old. Business Women's Holding Co. v. Farmers & Mechanics Sav. Bank, 194 Minn. 171, 175, 259 N. W. 812, 813, 99 A. L. R. 576, 579. We therefore hold that having relinquished their rights under the lease and under their oral contract which required Coleman to pay "good wages" and convey the southwest quarter of the farm to their son James, the Stouts sustained a legal detriment sufficient to support the new contract of October 8, 1956, which called for a different kind of performance by Coleman.

We recognize that there has been no appeal from the judgment awarding the southwest quarter to James and intimate no opinion as to whether our decision will have any effect on that judgment.

■ A more troublesome issue is whether a contract for the benefit

of an infant donee-beneficiary may be rescinded by the contracting parties without his assent. It is the general rule that such a contract may be abrogated at any time before it has been accepted or acted upon by the donee-beneficiary, but in some situations it has been held that an infant is presumed to have accepted the contract. Rhodes v. Rhodes (Ky.) 266 S. W. (2d) 790, 44 A. L. R. (2d) 1266; Annotation, 44 A. L. R. (2d) 1270; James v. Pawsey, 162 Cal. App. (2d) 740, 747, 328 P. (2d) 1023, 1028. Restatement, Contracts, § 142, states that unless the power to do so is reserved, the duty of the promisor to the donee-beneficiary cannot be released by the promisee. 2 Williston, Contracts (3 ed.) § 396B, notes that the general rule permits a discharge or variation of the obligation to the donee-beneficiary prior to his assent or his change of position.[2]

We do not feel the nature and extent of the services James rendered to Leo Coleman gave him any vested interest in his parents' contract. The Stouts testified that James helped Coleman dress and undress, assisted him in getting in and out of bed, and occasionally operated the farm machinery. However, inasmuch as James was 6 years old when he moved to Minnesota, these services were only those which any child would perform for a member of the family and were certainly not rendered in reliance on Coleman's commitment under the contract with the Stouts.

While we have prohibited a change of beneficiaries in insurance policies in the absence of an express reservation of the right to do so, the rule in such cases seems to have had its origin in statutory law and is confined to insurance matters. Page, *The Power of the Contracting Parties to Alter a Contract for Rendering Performance to a Third Person,* 12 Wis. L. Rev. 141, 173; Stahel v. Prudential Ins. Co. 189 Minn. 405, 249 N. W. 713.

Absent an actual conveyance of title conferring on the infant a

---

[2] See, also, Annotation, 53 A. L. R. 178; Stanfield v. W. C. McBride, Inc. 149 Kan. 567, 88 P. (2d) 1002; Page, *The Power of the Contracting Parties to Alter a Contract for Rendering Performance to a Third Person,* 12 Wis. L. Rev. 141; 38 Mich. L. Rev. 1093; In re Duluth, S. S. & A. Ry. Co. (D. Minn.) 58 F. Supp. 733; McCulloch v. Canadian Pac. Ry. Co. (D. Minn.) 53 F. Supp. 534.

vested interest in the real estate (whether or not possession and enjoyment are deferred), it is our opinion that the donee-beneficiary did not secure an indefeasible right to the southwest quarter of the Coleman farm under the oral contract between Coleman and the Stouts. On October 8, 1956, when the oral contract was, by operation of law, abrogated and rescinded, it was still executory to the extent that it had not and could not be fully performed by the Stouts, until the death of Leo Coleman. We hold that the issues here are governed by our decision in Emkee v. Ahston, 139 Minn. 443, 166 N. W. 1079. In that case parents conveyed a farm to a son on condition that during the remainder of their lives he pay them $200 a year and furnish them annually a 200-pound hog. In addition, the son was to pay his brothers and sisters varying sums of money after the parents' death, these amounts being made liens on the real estate. Two years later the son reconveyed to the parents who subsequently sold to a third person. An action to remove the liens was resisted by the brothers and sisters of the original grantee, who took the position that their interests were vested and could not be revoked. In upholding the determination of the trial court that the liens were terminated by the conveyance to the parents, we held that until a transaction is fully completed it may be rescinded. We pointed out that the conveyance to the son was defeasible if he failed to perform the conditions imposed, and since the other children were not burdened with any obligation under the contract, the parents and son were free to abandon and rescind it. Applying this principle to the facts of this case, we are of the opinion that since the contract between the Stouts and Coleman had not been fully performed on October 8, 1956, the infant donee-beneficiary at that time had no vested interest which the parties to the contract could not by mutual agreement rescind. We therefore hold that the written contract was valid and binding on both the parties and the donee-beneficiary, and accordingly, the appellants, Charley Stout and Mildred Stout, were entitled to judgment dismissing respondent's cause of action.

Reversed and remanded.