Rebecca Ann **TILTON**, Respondent,

v.

Edward **WOODS** et al., Appellants.

No. 49736.

Supreme Court of Missouri,

Division No. 1.

Sept. 9, 1963.

Motion for Rehearing or to Transfer to
Court En Banc Denied Oct. 14, 1963.

Baker & Baker, by Frazier Baker, Fulton, for appellants.

John M. Cave, Fulton, T. E. Lauer, Columbia, for respondent.

HOUSER, Commissioner.

Petition for a judicial declaration that a written contract affecting a 651-acre farm in Callaway County was terminated and canceled by a subsequent release and quitclaim deed; that plaintiff is the sole owner in fee simple absolute and that defendants have no right, title or interest in the real estate arising out of the contract, and to enjoin defendants from asserting claim to the premises thereunder.

Plaintiff is Rebecca Ann Tilton, who acquired the farm in 1944. Defendants are Edward and Anna Woods, husband and wife, parties to the original farm contract; their married daughter Darlene and Darlene's husband and minor children; Walter and Charlotte Woods, minor children of Edward and Anna, and all future, unborn and unknown heirs of the body of Edward and Anna. Defendants' answer attacked the validity of the release on the ground that it was obtained by misrepresentation, fraud and duress and that it was not supported by a valuable consideration. By counterclaim defendants sought to have the release and quitclaim deed declared void, or construed as limited and not absolute in effect, and asked for damages for breach of contract. At trial the counterclaim was amended to allege mistake in the execution of the release and quitclaim deed and to pray for reformation or construction of the instruments to conform to defendants' version of the meaning and intention of the parties.

Tried as an equity suit the trial judge found the issues for the plaintiff and against the defendants, sustained the release and quitclaim deed, canceled the written contract, declared that defendants had no right, title or interest in the farm except a leasehold interest soon to expire, and enjoined defendants in accordance with plaintiff's prayer. Defendants have appealed.

From 1945 to 1957 Rebecca rented the farm to three successive tenants, each of whom testified she promised to will the farm to him when she died if he would farm the place properly. In 1957 Rebecca, then living in California, wrote a letter to her nephew, Edward Woods, who with his wife Anna owned and was operating a farm in Shelby County, Missouri, proposing the rental of her farm to Edward as long as Rebecca lived stating that upon her death Edward would "get" the farm, upon his promise not to sell but to let the farm remain in his family. Rebecca told Edward and Anna by letter that she had already made a will to that effect. The property was worth $120,000 at that time. Edward and Anna went to California to discuss the matter with Rebecca. The Woods made it plain to Rebecca that they would not move onto the Callaway County farm "just to rent

the place" and insisted upon a document signed by her, giving Edward and Anna and their heirs the right to the farm upon Rebecca's death, so they "would have something to go on * * * a paper or something to make her word good."

Rebecca came to Missouri and on November 21, 1957 Edward, Anna and Rebecca entered into two contracts. One of them, a "will contract," recited Rebecca's ownership of the farm; her lack of descendants; her desire to keep the farm in her own family as long as possible; that Edward was the only nephew or niece willing to rent the farm; and that if Edward leased the farm it would be necessary for him to buy additional equipment, machinery and livestock. In consideration of Edward agreeing to lease the farm on Rebecca's terms and conditions during her lifetime in the manner she desired, the document recited that Rebecca had theretofore made and executed her last will and testament "devising said farm to my nephew, Edward Woods and Anna Woods, his wife, and to the heirs of their body." Edward and Anna, in consideration of the devise by the will, were obligated to move on the farm and operate it in the manner Rebecca wanted it farmed during her lifetime, and the lifetime of her ex-husband, Hugh Tilton. The document also contained an agreement by the Woods to keep the buildings, etc., in good repair, and a right on Rebecca's part to cancel the agreement on failure of the Woods to manage the farm properly or to make repairs.

The other contract executed November 21, 1957 was a 5-year farm lease to run from March 1, 1958.

The Woods believed that Rebecca had made a will as represented. Relying on the obligations assumed by Rebecca in the will contract they moved onto the Callaway County farm, bought additional machinery, farmed and remained in possession until the time of trial in November, 1961. In fact Rebecca had not made any such will, and at no time thereafter did she make any will in favor of the Woods or their bodily heirs.

The Woods had the will contract recorded. Later Rebecca applied to a bank for a $10,000 loan on the farm, which was turned down, apparently on the ground that the will contract constituted a "lien" on the land. Between February 3 and March 5, 1959 Rebecca wrote Edward and Anna a series of nineteen letters, complaining that the recording of the contract and placing of a lien on her farm put a cloud on the title, kept her from managing the farm, borrowing money, selling timber, dealing with the state highway department, etc., as she might wish; denying the right of the Woods to put a lien on her farm, and repeatedly and forcefully demanding that the will contract be "taken off the record," canceled and released so that she could proceed to get the loan. No agreement on her demands was reached by correspondence. Rebecca returned to Missouri and on March 11, 1959, in company with her attorney, went to the Callaway County farm where she demanded that the Woods sign two instruments, previously prepared by her attorney—a release and a quitclaim deed. There was testimony that Rebecca made some "pretty wild * * * pretty rough" statements and threats. Edward testified she said he would not live very long if the Woods did not sign the papers and there was testimony that Rebecca's statement was said in a serious manner and not as a joke. Edward believed that Rebecca was "capable of that sort of thing." In spite of Rebecca's insistence Edward and Anna did not sign the papers that evening. Rebecca stayed all night at the farmhouse with the Woods and for several days and nights thereafter. The Woods took the unsigned papers to their own attorney and sought his advice. On March 16, 1959 Rebecca, Edward and Anna appeared in the office of Rebecca's attorney, where the release was executed by all three of them and the quitclaim deed was executed by Edward and Anna.

The release referred to the contract of November 21, 1957 and recited that the parties thereto "now desire to cancel said Contract and render the same void, inopera-

tive and of no effect." For a recited consideration of $10 and other valuable considerations the parties agreed that the contract "is hereby canceled, and the same shall become void, inoperative and of no effect from and after the 11th day of March, 1959," and agreed that neither of the parties "is now indebted to the other for any cause whatsoever arising out of the contract dated November 21, 1957," and each party agreed "to release, indemnify and save the other party harmless from all further liability under said Contract." At the request of Anna and before it was signed the following words were added to the release as originally prepared: *"said release being made to enable the party of the first part to borrow money on the premises."* The quitclaim deed, in conventional form, quitclaimed the farm to Rebecca, her heirs and assigns, forever, "so that neither [Edward, Anna] nor their heirs * * * shall or will hereafter claim or demand any right or title to the aforesaid premises or any part thereof, but they and each of them shall, by these presents, be excluded and forever barred." The deed also recited that it was made "in full release and satisfaction of a certain Contract dated November 21, 1957, by and between Rebecca Ann Tilton * * * and Edward Woods and Anna Woods * * * which contract is recorded in [book and page], *said release being made to enable the said Rebecca Ann Tilton to borrow money on the premises."* (The last above italicized matter was added in the attorney's office at Anna's request before she would sign the quitclaim deed.) No money or other property was paid to Edward and Anna for the release or quitclaim deed.

On the same day, March 16, 1959, a one-year lease of the farm from Rebecca to Edward, ending March 1, 1960, with a right of renewal in Edward for an additional three years, was prepared in the lawyer's office, in terms almost identical to the previous five-year lease. This lease was signed by Rebecca about March 24, 1959, shortly before Rebecca returned to California.

The principal question on this appeal, whether the release and quitclaim deed were unconditional and effectively bar defendants' rights under the will contract, must be answered in the affirmative. The auxiliary question, whether these instruments must be reformed to give them a conditional and limited effect, leaving the will contract in force but enabling Rebecca to borrow money by mortgaging the farm, must be answered in the negative.

These instruments are plain and unambiguous on their face and absolute in form. The intention of the parties to abrogate, terminate and cancel the farm contract is manifested by positive language. The underlined material, instead of having the limiting effect contended for by appellants, expresses nothing more than a motive for their execution.

Pertinent excerpts from the series of letters written by Rebecca between February 3 and March 5, 1959 and the oral testimony of Edward and Anna with respect to the statements of Rebecca as to the effect of these instruments follow:

In the letter of February 3 Rebecca said, "If you and Ann want my farm when I pass out you get that lien off right now and don't ever put anything like that on again." On February 7 she said, "If you and Ann gets the farm you sure will have to cooperate with me. Get that lien off the record * * * You get that released right away or you will wish you had." February 9: "* * * You are going to take that contract recorded lien off the record and return to me by return mail or you and Edward can't expect to get the farm after I pass on—not if you are going to try to make me all kinds of trouble with you. You better not try to take advantage of me or you are the looser." February 14: "You have tried to take advantage of me which will not be to your gain. * * * If you don't trust me without putting a lien on my property you don't deserve the farm or any other estates of mine. I trust you. Why can't

you trust me. * * * I am going to let you take me to court and you will get the lien off permanently forever. Not temporarily like your attorney wanted to do." February 18: "I'm counting on going to court for sure unless you release the lien (*permanently*)." On February 24 Rebecca sent quitclaim deed forms for execution, saying: "I have had my final papers and will fixed so that who ever puts a lien or contract recorded against my farm is barred indefinitely against claiming my farm or any part of the farm or from any part of my estate (*ever*) when I die. Nobody gets nothing. My farm * * * is being given away while I am living. * * * When I die no one gets anything." February 25: "You will have to trust me * * * and without a [lien or recorded contract against my property]. * * * So if you put a claim, lease, or recorded contract recorded against my title you jeopardize you getting my farm ever. When you put the lien on my title or put your lien on record at recording office Fulton you canceled your right to my farm and other estates." February 26: "You will have to trust me without a lien or contract recorded * * * if you stay on my farm. (And I mean it.)" February 27: "There has never been any one as mean to me in my whole life as you and Edward has treated me by sneaking on the lien."

In their answering letters the Woods denied they had put a lien on the farm; suggested to Rebecca that "maybe if you were here we could have the contract changed so you could get your loan"; that if Rebecca did not want the Woods to run the place she could pay them $3000 for their expenses and trouble in moving and "Then we could cancel all contracts and we would move back." On February 17 Edward wrote her: "Was over to Fulton. I found out that contract can never be taken off record. It can be made worthless. So get yourself back here. We will settle it some way. That contract stays on record unless we cancel all contracts including farm contract."

Edward and Anna testified that Rebecca told them, both before and at the time these instruments were executed, and that the Woods understood, that the release and quitclaim deed were made in order to enable Rebecca to get a loan, and "nothing else," that in other respects the agreement that the Woods and the heirs of their body would "get the farm" after Rebecca's death remained the same; that Rebecca stated that she still intended and wanted the Woods to get the farm and "the quitclaim wouldn't have nothing to do with that part of it, only for the sole purpose so she could borrow money." Anna testified that Rebecca said, and the Woods understood, that the Woods and their heirs would "still have the same rights" that they had before the documents were signed; that the Woods believed and relied upon Rebecca's statements, and that the material above italicized was inserted in the two instruments to effect this result; that in executing the instruments it was not the Woods' intention to cut themselves or their heirs out of their interests in the land or of making a gift to Rebecca of their rights or those of their children; that Edward's understanding was that the will contract would "still be good."

But, inconsistently, Edward testified that it was his understanding that Rebecca wanted the will contract eliminated completely; that Rebecca thought that it would be canceled, and "No doubt she aimed to cancel the whole deal," and Anna testified that she interpreted Rebecca's letters to mean that Rebecca wanted the will contract canceled, taken off the records, and "eliminated completely."

Rebecca, present in court, did not testify. Defendants read the part of her deposition in which she indicated that her idea and purpose in having the release and quitclaim deed executed was to enable her to obtain a loan upon the farm, "nothing else."

After her return to California Rebecca wrote the Woods that it was a good thing they signed the release and quitclaim deed; otherwise she could not have got the $10,-

000 loan; that the lender's manager told her he would not lend the money with that contract recorded "so when I told him it was canceled he then made me the loan." After March 16, 1959 Rebecca made three testamentary dispositions which expressly provided that the Woods take no interest in the farm at her death. The option to renew the three-year lease was exercised by Edward in 1960. At trial Edward testified that he and his wife were ready, willing and able to perform their contracts with Rebecca, but that Rebecca did not want him to operate the farm the rest of her life; that Rebecca wanted him off the farm as soon as possible. Inconsistently, Anna testified that Rebecca indicated that she wanted them to continue under the lease, by telling Edward "what she wanted to plant next year."

On this record defendants did not meet the burden of proving a case of misrepresentation, fraud, or mutual mistake. Neither the testimony of the Woods, nor the 19 letters written by Rebecca, is persuasive that the Woods signed the release and quitclaim deed upon the basis of a fraudulent misrepresentation that their rights in the land were to survive the execution of these instruments which so positively and unequivocally bespeak abrogation and cancellation, or that the only effect of the instruments on the will contract would be to permit Rebecca to borrow $10,000 on the land. Nor in our judgment do the credible facts indicate mutual mistake. Although Rebecca's letters in early February impliedly recognize the right of the Woods to the farm upon Rebecca's death, the tenor of the letters toward the end of February changed as she failed to get a favorable response to her demands for immediate action, demands vigorously presented every day or two. Toward the last she berated the Woods, and shamed and derided them for professing to be Christians while at the same time taking advantage of an old lady. Toward the last she showed a disposition to cancel the contract "for sure and permanently * * * forever, not tempora-

rily" and to exclude the Woods. Finally she plainly told them that she had had her will fixed so that anyone recording a contract against her farm, as she considered the Woods had done, would be "barred indefinitely" from claiming the farm or any of her estate, and told them that at her death nobody would get anything; that the rights of the Woods had been canceled by the act of recording the contract; that the Woods had been "mean" to her and that they would be the "looser" (sic).

Edward and Anna's testimony that Rebecca said she still intended for them to get the farm, and that these instruments would not affect their rights under the will contract, is not accepted. It is rendered suspect for several reasons. On cross-examination Edward and Anna both conceded that according to their understanding and interpretation of Rebecca's wishes and letters, the will contract was to be completely eliminated. Edward had "no doubt" that she "aimed to cancel the whole deal." Edward's letters plainly indicate that he too was contemplating cancellation "of all contracts including the farm contract." No agreement was reached between Rebecca and the Woods in the course of the intensive exchange of letters. Rebecca considered it necessary to make a trip from California to Missouri to effect an agreement. Obviously the agreement Rebecca had in mind, as represented by the unconditional release and quitclaim deed which she had her attorney prepare and which she presented to the Woods on her return, contained no reservation of any rights in the Woods. Several days passed before these instruments of abrogation were executed by the Woods. In the meantime the Woods had ample opportunity to read, know and understand their contents and effect. They took them to their own lawyer and asked him what he thought of them, and had the benefit of the advice of independent counsel with respect to their meaning and effect. It is difficult to believe that under these circumstances the Woods could have seriously entertained the thought that the

only effect of these instruments would be to permit Rebecca to obtain a $10,000 loan on the land. The conduct of the Woods in executing a new three-year farm lease appears to have been a tacit recognition that the slate had been wiped clean by the instruments in question; that the release and quitclaim deed terminated not only the will contract but also the existing farm lease, thereby stripping them of present as well as future interests and requiring a new lease if the Woods were to have the right to continue to farm the land.

Anna's testimony that Rebecca "stood right up against the wall" in the attorney's office, on March 16, 1959, and said "she still wanted us to have the place" and that the quitclaim "wouldn't have nothing to do" with their getting the farm is uncorroborated, and considering the exasperated state of mind Rebecca was in by that time, and her changed attitude as expressed in her letters, we are not willing to accept it as a fact. We interpret Rebecca's statement in the deposition that the release and quitclaim were to enable her to obtain a loan on the farm, "nothing else," as a statement of her original motive in initiating the effort to have the contract "taken off the record," at which time (in early February) she continued to recognize the Woods' rights to inherit the farm after her death, if they would cooperate with her. But as we have indicated her attitude changed bebetween February 3 and March 11, as a result of the failure of the Woods to promptly accede to her wishes, and by the time she had the papers prepared she was of a different mind, was hostile toward the Woods, and in our view was determined to procure an unconditional release.

Defendants' contradictory, nebulous and incredible evidence does not constitute the clear and convincing proof required before a court of equity will set aside a deed or reform a contract on the ground of misrepresentation, fraud or mutual mistake.

Nor is the charge of duress sufficiently substantiated to make a case. We are not convinced that the letters, the threat, or Rebecca's "rough and wild" statements were of such a nature as to prevent the Woods from exercising their free wills. Considering the age of Rebecca and that of the much younger Woods, the relation of the parties, the tone and tenor of the letters exchanged, the time spread between the presentation and the execution of the documents, the fact that the Woods had the benefit of the advice of their chosen counsel, the circumstances under which the papers were signed, and the fact that neither Edward nor Anna testified that the instruments were executed as a result of compulsion, threats or fear, we hold that the release and quitclaim deed were not procured by duress.

In our judgment the will contract was canceled, abrogated and rescinded by the release and quitclaim deed.

■ Edward and Anna seek the benefit of a presumption that Rebecca's testimony would have been unfavorable to Rebecca since she did not take the stand and testify, but this rule is inapplicable where the testimony is unnecessary. The burden of proof on the issue of mistake was upon defendants, and they did not sustain that burden. No unfavorable presumption arises because of the failure of Rebecca to testify until defendants made a prima facie case. Talley v. Richart, 353 Mo. 912, 185 S.W.2d 23, 27. "No duty rests upon the party charged to speak until the other party has introduced evidence which, unexplained, makes a case against him." Bahl v. Miles, 222 Mo.App. 984, 6 S.W.2d 661, 664.

Defendants contend, however, that the interests of the heirs of the body of Edward and Anna under the will contract were not affected by the release and quitclaim deed, urging that these heirs were third party beneficiaries; that the contract did not reserve the right to rescind as to them and therefore their rights could not be terminated by a rescission by the parties signatory; that the contract had been

executed by Edward and Anna up to the time of trial; and that identification of the "heirs of the body" or proof of knowledge or action on their part was not essential.

■ Assuming that the heirs of the body are third party beneficiaries under the contract and not incidental beneficiaries merely, and further assuming that the rule stated in Restatement, Contracts, § 142 [1] is applicable to third party beneficiaries in the case of an unconditional promise for the benefit of a third party, we are nevertheless of the opinion that the interests of the heirs of the body were extinguished by the rescission of the contract by the contracting parties. The rule stated in said § 142 relates to unconditional promises and has no application here. This contract did not give the heirs of the body a vested interest or an indefeasible right to an interest in the farm, see Lehman v. Stout, 1961, 261 Minn. 384, 112 N.W.2d 640, nor was the promise of Rebecca in favor of the heirs of the body unconditional. On the contrary, Rebecca's promise was conditional upon performance by the promisees. That condition was not fulfilled. The injustice of allowing a mere donee to enforce a promise where the substantial matter the parties had in mind was the performance of the promises and the promisor has not received what he bargained for, is pointed out in 2 Williston, Contracts, 3rd Ed., 1959, § 395. Rebecca's promise to devise the farm was conditioned upon the continued performance by Edward and Anna during the lives of Rebecca and Hugh of their obligation to manage and operate the farm, make repairs, etc., under the contract. The contract specifically reserved to Rebecca the right to cancel if Edward and Anna failed to manage or repair as promised. At the time of the rescission the contract remained executory and only partially performed—it could not have been fully performed by the promisees Edward

and Anna until the occurrence of the deaths of Rebecca and Hugh. When the parties rescinded the contract by the execution of the release and quitclaim deed they thereby released and canceled all rights and duties arising under the contract, including the duty of Edward and Anna to manage, repair, etc., under that contract. Thereafter Edward and Anna did not continue to manage, repair, etc. under the contract, but under a new lease. In Restatement of Contracts, § 140, the rule is laid down that if after the formation of a contract it "subsequently ceases to be binding * * * because of * * * the present or prospective failure of the promisee to perform a return promise which was the consideration for the promisor's promise, the right of a donee beneficiary * * * under the contract is subject to the same limitation." The rescission of the contract by mutual consent constituted a nonfulfillment of the condition and effectively terminated the rights of the heirs of the body. 4 Corbin on Contracts, § 816.

■ The release and quitclaim deed are not void for lack of consideration. The farm contract was executory in nature, and the undischarged obligations could be canceled by mutual agreement. The release is a bilateral contract. Consideration is to be found in the mutual release by each of the parties of all rights arising out of the contract. Each side gave up valuable rights and was exonerated from the performance of definite legal obligations. The quitclaim deed, executed at the same time and as part and parcel of the agreement to extinguish the will contract, is supported by the same consideration which supports the release (although as between the parties consideration is not necessary to the validity of a deed, Binnion v. Clark, 359 Mo. 202, 221 S.W.2d 214, 217).

Defendants' claim for breach of contract, necessarily based upon the continued

---

1. "Unless the power to do so is reserved, the duty of the promisor to the donee beneficiary cannot be released by the promisee or affected by any agreement between the promisee and the promisor * * *."

existence of the will contract, falls by reason of the cancellation and rescission effected by the instruments executed March 16, 1959. In the release each side agreed that neither was indebted to the other for any cause whatsoever arising out of the farm contract and agreed to release, indemnify and save the other harmless from all further liability under the contract. This eliminated the foundation of any claim for breach of contract.

■■ The next question is whether Rebecca's cause is barred by the clean hands doctrine. Appellants maintain that Rebecca does not have clean hands because she (1) induced the Woods to move onto her farm and sign a lease upon the false representation that there existed a will in favor of them and their bodily heirs when in fact there was none and specifically disinherited Edward and Anna and their bodily heirs by a codicil to her will; (2) induced the Woods to sign the release and quitclaim deed by representing that the sole purpose of these instruments was to enable her to borrow money and that they would not affect their rights and now claims their rights were extinguished, and was thus "guilty of fraud and deceit in the beginning"; (3) engaged in a continuous pattern of fraud and deceit in getting tenants to work her land "as future owners" on the promise that they would get the land after her death; (4) failed to take the stand and testify, notwithstanding many of the facts were within her personal knowledge.

As to (1) Rebecca had until the time of her death to make good on her obligation to make a will in accordance with the terms of the contract; and the express disinheritance complained of occurred some time after the execution of the release and quitclaim deed, at a time when she would have been fully justified in considering that she had no further obligation to the Woods and their bodily heirs owed them no duty to leave the farm to them upon her death, and had the right to specifically disinherit

them. Objection (2) is the crux of the case, and does not properly relate to the question of clean hands. (3) involves transactions between Rebecca and persons not parties to this action, is too remote in time to affect the case, and is not supported by proof that in each instance Rebecca's promises were not made in good faith, or that she had not been released from her promises. (4) is no indication of unclean hands. It could under conceivable circumstance raise a presumption that Rebecca's testimony would have been unfavorable, but not in this case for the reason heretofore given. Defendants had the right to call Rebecca to the stand as an adverse witness, § 491.030, R'SMo 1959, V.A.M.S., but they did not avail themselves of this right. Rebecca had testified by way of deposition, and defendants read into the record parts of her testimony, thereby placing Rebecca's statements and testimony before the court. Rebecca did not refuse to testify or to answer any particular questions put to her, and as pointed out in her brief, defendants do not show what matters were peculiarly within Rebecca's knowledge.

■ The judgment taxing all costs against defendants did not constitute an abuse of discretion, as claimed. Plaintiff prevailed on the count of her petition on which the case was tried, and on defendants' counterclaim. The only action of the court favorable to defendants' claims was the finding that the Woods were entitled to stay on the farm for another sixteen months under the renewal provision of the March 1, 1960 farm lease. This point was not contested, except in the pleading stage. A court of equity has a wide discretion in the assessment of costs, Schwartz v. Shelby Construction Co., Mo.Sup., 338 S. W.2d 781, 795, Sup.Ct. Rules 77.08, 77.09, V.A.M.R., and we find no abuse of discretion here.

■ It is urged that the court erred in failing to have any issues tried by jury. This point is ruled against defendants be-

cause of the vagueness of the charge, and because this case became and was a suit in equity, in which case the court was not obligated to utilize the services of a jury.

Finally, the record does not bear out defendants' contention that the court erred in not admitting a number of defendants' exhibits.

Respondent's motion to dismiss the appeal for failure to comply with the rules of this Court is overruled.

Judgment affirmed.

COIL, C., concurs.

PER CURIAM.

The foregoing opinion by HOUSER, C., is adopted as the opinion of the court.

All of the Judges concur.