**CULLIGAN INTERNATIONAL COMPANY, a Delaware corporation, Plaintiff,**

v.

**CULLIGAN WATER CONDITIONING OF CARVER COUNTY, INC., a Minnesota corporation; and Kenneth R. Mayer, Jr., Defendants.**

**Civ. No. 4–83–56.**

United States District Court, D. Minnesota, Fourth Division.

May 17, 1983.

Frank J. Walz and Robert A. Brunig, O'Connor & Hannan, Minneapolis, Minn., (Charles W. Werhane, Northbrook, Ill., of counsel), for plaintiff.

Arthur C. Benson, Morris, Harvey, Sheehan & Fuller, Minneapolis, Minn., for defendants.

## MEMORANDUM INCORPORATING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER DENYING PRELIMINARY INJUNCTION

MacLAUGHLIN, District Judge.

This diversity and trademark case is before the Court on plaintiff Culligan International Company's (CIC) motion for a preliminary injunction.[1] Plaintiff CIC seeks an order enjoining defendants Culligan Water Conditioning of Carver County, Inc. (Carver Culligan) and Kenneth R. Mayer, Jr. (Mayer) from using various trademarks in connection with the sale or lease of water conditioning equipment or services. The Court held an evidentiary hearing during which the parties presented testimony from witnesses and introduced numerous exhibits. This Memorandum incorporates the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). For the reasons stated below, the Court will deny the plaintiff's motion for a preliminary injunction.

## FACTS

Plaintiff CIC is a Delaware corporation with its principal place of business in Northbrook, Illinois. CIC manufactures and distributes water softeners and related equipment. As part of its business, CIC

---

1. The plaintiff commenced this suit on January 17, 1983. The defendant Culligan Water Conditioning of Carver County, Inc. (Carver Culligan) commenced a related suit in the First Judicial District, Carver County, Minnesota, on January 19, 1983. Plaintiff Culligan International Co. (CIC) removed that case to federal court. On February 16, 1983, the Court denied Carver Culligan's motion to remand that case to state court. *See Culligan Water Conditioning of Carver County, Inc. v. Culligan International Co.,* CIVIL 4–83–71.

licenses the use of its trademarks. In 1972 defendant Mayer purchased all the outstanding stock of an existing Culligan franchisee in the Watertown, Minnesota area. In connection with that purchase, Mayer, as president of Carver Culligan, applied for and was granted a transfer of the existing franchise. Prior to his purchase of the franchise, Mayer had been employed as a district manager by CIC for approximately 13 years.

On July 6, 1972, CIC and Carver Culligan executed a Service Dealer Franchise Agreement (1972 Franchise Agreement) and a Product Dealer Sales Agreement (1972 Sales Agreement). According to these agreements, Carver Culligan promised to operate the franchise according to prescribed methods known as the Culligan Plan and to participate in regional and national cooperative advertising programs. Carver Culligan also agreed to submit monthly sales reports to CIC so that the amount of Carver Culligan's advertising contribution, which was based on a percentage of sales, could be figured. CIC agreed to contribute to the national advertising cooperative an amount equal to Carver Culligan's contribution. The 1972 Franchise Agreement provided that either party could terminate the agreement upon 90 days written notice and that CIC could terminate the agreement within 10 days after delivery of notice if Carver Culligan failed to pay any sums it owed CIC.

Between July 6, 1972, and March 11, 1981, Carver Culligan was, on several occasions, delinquent on its accounts with CIC and on a promissory note it had executed with CIC. Mayer executed the note on behalf of Carver Culligan in February, 1978. The note was in the principal amount of $8,753.57 with 15 percent interest per year. The note was executed to schedule repayment of amounts owed by Carver Culligan to CIC. The schedule called for 36 payments at $303.45 per month to begin on March 15, 1978. Only one payment of $500 was made on the note before March 11, 1981. The $500 payment was applied to the interest owed.

Several times prior to March 11, 1981, CIC attempted to collect the delinquent amounts. On August 23, 1979, CIC's credit manager notified Carver Culligan by letter that it must correct its delinquencies or CIC would turn the note over to a collection agency. The credit manager's letter itemized the amount of principal and interest owed. On March 14, 1980, the CIC credit manager again notified Carver Culligan that it was seriously delinquent in its payments on the promissory note and that all future orders would only be on a C.O.D. basis. The amount owed was not mentioned in this letter. On September 23, 1980, CIC again demanded payment. In this letter the credit manager referred to a telephone conversation in which Mayer promised to make full payment on the past due amounts by October 7, 1980. On January 14, 1981, Alan Jackson (Jackson), the manager for franchise and dealer development, notified Mayer that he was $14,548.35 in arrears on the note and open account. Jackson stated that unless this amount was paid in full by February 28, 1981, CIC intended to cancel Mayer's franchise.

On February 4, 1981, Mayer wrote a letter to Jackson and requested duplicates of the promissory note and the calculation sheets used to compute the total amount owed. Mayer stated he needed these records because his own records had been destroyed by a storm. On February 17, 1981, Jackson responded to Mayer's request by sending him a worksheet that showed the principal amount of the note and the amount of the monthly payments as well as the amounts owed on the note through September 15, 1979. The worksheet did not mention the current amount due on the note. The worksheet also did not show any of the amounts claimed due on Carver Culligan's open account. Mayer disputed then as well as at the time of the hearing on the present motion that Carver Culligan owed certain amounts on its open account.

On March 11, 1981, Jackson notified Mayer that his franchise would be terminated within 60 days from receipt of this letter unless Mayer paid his delinquencies by May

15, 1981. Jackson did not specify the amount owed or the basis for any amount owed. Mayer requested an itemization of these amounts, but he did not receive such an itemization until after the date the franchise was allegedly terminated. On May 6, 1981, Mayer wrote to Neal Mayer (N. Mayer), vice president of CIC, and stated his willingness to settle his delinquencies. On May 15, 1981, the date Jackson had indicated that Mayer's franchise would terminate, Jackson wrote Mayer and itemized the amounts owed on the note ($8,753.57 principal and $3,118.47 interest from January 1, 1979, to May 15, 1981) and the amount owed on the open account ($2,500.04).

Mayer submitted $7,114.14 to CIC on May 18, 1981, and stated he would submit the remaining amount after he received proper documentation. On May 21, 1981, Jackson acknowledged receipt of Mayer's check but stated that the franchise had terminated on May 15, 1981, because Mayer had failed to pay the full amount of the delinquencies by that date. In addition, Jackson stated that unless the balance was paid in full, CIC would take legal action to recoup the amounts claimed. CIC's credit manager sent Mayer the requested documentation of the claimed amounts on May 22, 1981. Mayer paid all of the claimed amounts except for some disputed C.O.D. items within a month after receiving the documentation from CIC.

Mayer, N. Mayer, and Jackson met on July 8, 1981. N. Mayer and Jackson reasserted that Mayer's franchise had been terminated, but they offered Mayer a one-year probationary period as a way to regain a franchise. Two documents set forth the terms of the agreement. The first is a letter from N. Mayer dated July 14, 1981, in which he set forth the following terms:

1. Our agreement will be in effect for one year. During that term, you will have the right to use our name and trademarks, as in the past.

2. A $3500.00 line of credit will be established to facilitate your distribution of Culligan products. A unit commitment will be established based on your past performance of 145 units and the purchase of these units will be through the Watertown account number. Our terms of payment are 1–10–30. If at any time during the course of our agreement your open account becomes delinquent, all shipments will stop and our agreement will be terminated.

3. You will demonstrate your good faith and commitment to the Culligan system by reestablishing your relationship with the local co-op group. We ask that you meet with the officers of the co-op and present an acceptable payback plan to eliminate your delinquent debt and assume active participation in the co-op.

N. Mayer indicated in this letter that Mayer must perform these requirements "to the letter."

The second document is a sales agreement (1981 Sales Agreement) signed by both Mayer and CIC's president. This document states that Carver Culligan must sell 150 household water softener units; that the agreement covers the period from August 1, 1981, to July 31, 1982; and that Carver Culligan agrees to acquire the products from CIC and to promote sales "through selected media."

Plaintiff CIC contends Mayer breached the 1981 Sales Agreement by failing to purchase the required number of household softening units from CIC and by failing to participate in the regional cooperative advertising group. In addition, CIC contends the defendants have improperly continued to use CIC's trade and service marks even though the franchise has been terminated.

Plaintiff CIC commenced this suit on January 17, 1983. The plaintiff requests preliminary and permanent injunctions against Carver Culligan and Mayer to prohibit them from infringing CIC's trade and service marks, from using CIC's trade and service marks in a false and deceptive way, from engaging in unfair competition, from using deceptive trade practices, from engaging in unlawful trade practices, and from breaching the 1972 Franchise Agree-

ment and 1972 Sales Agreement. The plaintiff is only seeking a preliminary injunction at this time.

The defendants deny the plaintiff is entitled to a preliminary injunction. The defendants concede that if their franchise license has been properly terminated, they are in violation of the Lanham Act, 15 U.S.C. § 1114, by their continued use of CIC's trade and service marks. However, the defendants claim that their franchise was not properly terminated and that their continued use of these trade and service marks is therefore authorized. In addition, the defendants claim that even if the 1972 Franchise Agreement was properly terminated, the 1981 Sales Agreement was also a franchise agreement and it was not properly terminated.

## DISCUSSION

The United States Court of Appeals for the Eighth Circuit has articulated the following four factors a court must consider in determining whether to grant a preliminary injunction:

> (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir.1981). The Eighth Circuit has also stated that these four factors are not to be applied mechanically. Instead, a court should use these factors in a flexible manner to resolve the issue of whether "the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* (footnote omitted).

**1. *Probability of Success on the Merits***

The third *Dataphase* factor—the probability that the movant will succeed on the merits—is the central issue in this case. To prevail on its injunction motion, the plaintiff does not have to prove a greater than 50 percent chance of success. *Id.* In assessing the plaintiff's likelihood of success on the merits, the Court must examine two issues: (a) whether the 1972 Franchise Agreement was properly terminated; and (b) whether the defendants waived their rights even if the 1972 Franchise Agreement was not properly terminated.

**a. *Termination of 1972 Franchise Agreement***

■ The defendants claim that the notice of March 11, 1981, which stated that CIC would terminate the franchise, was inadequate because it failed to provide sufficient information to allow the defendants to cure their default. The defendants claim that this improper termination was a violation of the Minnesota Franchise Act (Act), Minn. Stat. § 80C.14, subd. 2(a)–(c). The plaintiff, on the other hand, claims the March 11, 1981 notice was sufficient and that the franchise was properly terminated for good cause.[2]

No cases have been decided that clearly set out the notice requirements. The Act itself provides that the following actions, among others, are unfair practices:

> (a) Terminate or cancel a franchise without first giving written notice setting forth all the reasons for the termination or cancellation to the franchisee at least 60 days in advance of termination or cancellation ....

> (b) Terminate or cancel a franchise except for good cause. "Good cause" shall be failure by the franchisee substantially

2. The Court is assuming for purposes of this motion that the Minnesota Franchise Act (Act) applies to both the 1972 and 1981 agreements. The plaintiff argued at the evidentiary hearing that it had complied with the Act's requirements, not that the Act was inapplicable. However, the plaintiff has subsequently challenged the Act's applicability to the 1972 Franchise Agreement in a summary judgment motion. The plaintiff argues that the application of the Act to the 1972 Franchise Agreement would be a retroactive application of the law and that such an application would constitute an unconstitutional impairment of contract. The Court will not rule on that issue in this decision since it is pending before the Court on the summary judgment motion which has not yet been decided.

to comply with reasonable requirements imposed upon him by the franchise . . . .

(c) Fail to renew a franchise unless the franchisee has been given written notice of the intention not to renew at least 90 days in advance thereof and has been given a sufficient opportunity to recover his investment unless the failure to renew is for good cause as defined in clause (b).

Minn.Stat. § 80C.14, subd. 2.

The Court finds that the Act requires a franchisor to give a franchisee specific notice of its delinquencies so that the franchisee can have a meaningful opportunity to cure them. Specific notice furthers the Act's remedial and protective purposes. *Martin Investors, Inc. v. Vander Bie,* 269 N.W.2d 868, 872 (Minn.1978). Such notice is particularly necessary in cases involving a claim that the franchisee owes money.[3] In cases like the present one which involve ongoing charges on a monthly account as well as credits for returned merchandise, the franchisor may be the only one that knows precisely how much the franchisee owes at a given time. In addition, such notice gives the franchisee an opportunity to challenge any amounts it believes are inaccurate.

The Court finds that the plaintiff failed to give adequate notice to the defendants of their alleged delinquencies. The March 11, 1981 letter purporting to terminate Carver Culligan's franchise does not state with particularity what the defendants had to do to correct their deficiencies. The letter merely states that the franchise will be terminated within 60 days unless the defendants pay the money they owed CIC. The letter makes no mention of the exact amount owed.

The Court has concluded that a fair and reasonable interpretation of the Franchise Act requires that a franchisee be informed in the notice of termination what dollar amount must be paid to the franchisor in order to comply with the franchise agreement and to prevent its cancellation. Since that was not done in the instant case, the termination notice was fatally defective.

The plaintiff argues that prior correspondence adequately informed the defendants of the amount due. The Court finds this argument unpersuasive. Jackson's letter of January 14, 1981, stated that the defendants owed $14,548.35 as of December 31, 1980, but neither the March 11, 1981 termination letter nor Jackson's February 17, 1981 letter updated the amounts the defendants owed nor itemized the amounts due on the open account and the amounts due on the note. Mayer repeatedly requested this information, but it was not furnished to him until May 22, 1981, when R.O. Schlosser, CIC's credit manager, wrote a letter to Mayer including both an itemization and the supporting documents for the claimed amounts. However, Jackson informed Mayer in a letter dated May 21, 1981, that the franchise had been terminated on May 15, 1981—one week before the requested information was sent.

Therefore, the Court concludes that because the plaintiff failed to give valid notice of termination under the Act, the 1972 Franchise Agreement has not been terminated.

### b. *Waiver of Rights*

■ Even if the 1972 Franchise Agreement were improperly terminated, the plaintiff argues that the defendants waived any rights they had by accepting the 1981 Sales Agreement. The plaintiff's waiver argument is based on a novation theory.

The Minnesota Franchise Act does not favor waivers. Section 80C.21 provides as follows:

Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of sections 80C.01 to 80C.22 or any rule or order thereunder is void.

---

**3.** An analogous case is presented by the cancellation of a contract for deed. Under Minn.Stat. § 559.21, a party cancelling a contract for deed must state with particularity the amount due. The purpose of such a statutory notice procedure is to give vendees notice of the impending cancellation and a reasonable period of time in which to redeem their interest. *Conley v. Downing,* 321 N.W.2d 36 (Minn.1982).

However, the Act does permit voluntary settlements of disputes. The Court finds that the 1981 Sales Agreement was not a waiver or voluntary settlement of a dispute under the Act.

The only evidence that Mayer may have waived his rights under the Act is his signing of a subsequent sales agreement and his failure to respond to N. Mayer's letter dated July 14, 1981, in which N. Mayer discussed the May 15, 1981, franchise termination and stated that Mayer had requested "a probationary testing of [his] performance as a way back toward a franchise." The Act clearly prohibits the plaintiff from requiring a waiver of rights under the Act as a condition for obtaining a franchise. If Mayer's alleged waiver of his rights was a condition for receiving the new 1981 Sales Agreement, the waiver would be void under section 80C.21. *See also* 14 M.C.A.R.S.Div. 1714(d) (1975).

The plaintiff argues that the 1981 Sales Agreement was entered into voluntarily as a settlement of any disputes between the parties. The evidence does not support this argument. Mayer claims that at the time he entered into the 1981 Sales Agreement he was unaware that the alleged termination of the 1972 Franchise Agreement was invalid and that he would be waiving any rights under the Act by signing the second agreement. Mayer's prior experience as an employee of CIC did not acquaint him with the Act or a franchisee's rights under the Act. Mayer did not consult with an attorney concerning his rights; instead, he relied upon the franchisor's representations that his franchise had been terminated. Mayer believed the only way he could continue in business was to sign the 1981 Sales Agreement. To find that Mayer "voluntarily"

waived his rights under such circumstances would eviscerate the remedial purposes of the Act.

The plaintiff argues further that the 1981 Sales Agreement constituted a novation and, as such, it extinguished the defendants' rights concerning the 1972 Franchise Agreement. If Mayer accepted the 1981 agreement in satisfaction of CIC's duties under the 1972 agreement, the 1981 Sales Agreement would be a substituted contract[4] and would under ordinary contract principles discharge any duties owed by the franchisor under the 1972 Franchise Agreement. *See Restatement (Second) of Contracts* § 279 Comment (a) (1981). There is no evidence that Mayer viewed the 1981 agreement as a substitute for the prior agreement. Mayer, relying on the plaintiff's statements, believed the prior agreement had been terminated and that he no longer had any rights under it. Therefore, there is no evidence that Mayer accepted the 1981 agreement in satisfaction of CIC's duties under the 1972 agreement. In addition, under the Act the 1981 Sales Agreement is void as an unknowing and involuntary waiver of rights. Thus, the defendants are not bound by the substituted contract and have recourse to the original franchise agreement. *Cf. Restatement (Second) of Contracts* § 279 Comment (b) (1981) (if substituted contract is vulnerable on grounds such as mistake, misrepresentation, unconscionability on statute of frauds, recourse may be had on original contract).

The plaintiff's reliance on *Lehman v. Stout,* 261 Minn. 384, 112 N.W.2d 640 (1961), is misplaced. The Minnesota Supreme Court in *Lehman* held that the doctrine of integration and the parol evidence rule make inoperative all prior oral and written

4. The word "novation" has been used in a variety of contexts, but its more precise definition is a substituted contract involving at least one new party who replaces one of the parties to the prior contract. *See Restatement (Second) of Contracts* § 280 (1981); J. Calamari and J. Perillo, *Contracts* 767 (2d ed. 1977). Since no new party replaced one of the original parties in the 1972 Franchise Agreement, the 1981 Sales Agreement is not technically a novation but merely a substituted contract.

*Restatement (Second) of Contracts* § 279 (1981) defines a "substituted contract" as follows:

(1) A substituted contract is a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty.

(2) The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty.

agreements concerning substantially the same subject as a later written contract. *Lehman* did not involve a franchise nor the application of a remedial statute similar to the Act. Therefore, *Lehman* provides little guidance in the present case.

2. *Other Dataphase Factors.*

Because the Court has found that the plaintiff is unlikely to succeed on the merits, the Court will only briefly discuss the other three *Dataphase* factors.

■ The irreparable harm alleged by the plaintiff is not so severe that a preliminary injunction is required. The plaintiff alleges two types of harm. First, the plaintiff claims that Carver Culligan's continued use of its trademarks and slogans will confuse its customers by creating the impression that Carver Culligan is an authorized franchise dealer. As discussed above, the Court finds that on the basis of the evidence presented so far, Carver Culligan is an authorized dealer because its 1972 Franchise Agreement was not properly terminated. Therefore, no false impression is created.

In addition, the plaintiff claims its reputation is being harmed by Carver Culligan's continued use of its trademarks because the plaintiff can no longer control the nature and quality of goods distributed under its trademark. The plaintiff did not present any evidence that Carver Culligan is selling some other manufacturers' products under the plaintiff's trademarks. Because the Court has found the 1972 Franchise Agreement remains in effect, the plaintiff has the same ability to control the quality and nature of the goods Carver Culligan distributes as the plaintiff always had.

The harm to the defendants caused by granting the plaintiff's motion far outweighs the harm to the plaintiff caused by the defendants' continued operation of the Carver Culligan franchise. The defendants would incur substantial disruption of their business if they were forced to change all their advertising, including telephone directory advertisements, in order to eliminate the use of the plaintiff's trademark. The defendants' customers would likely be confused by the changes and might reasonably believe that the defendants could no longer provide service and parts.

Despite the plaintiff's claims, the public interest would best be served by denying the plaintiff's motion. A denial will reaffirm the policies behind the Act and preserve the status quo until a final determination can be made on the merits.

Although the Court has found invalid the plaintiff's past attempts to terminate the Carver Culligan franchise, the Court does not condone the defendants' repeated delinquencies over several years. If the defendants are presently delinquent in payments, the Court's ruling does not in any way limit the plaintiff's ability to terminate the franchise as long as the plaintiff gives the defendants specific notice of any deficiencies and complies with the other requirements of the Act.

Accordingly, IT IS ORDERED that the plaintiff's motion for a preliminary injunction is hereby denied.